Lydia H. GROTTI, M.D., Appellant,

v.

BELO CORPORATION, d/b/a Belo; WFAA–TV, L.P., d/b/a WFAA–TV (Channel 8) and WFAA–TV Co.; WFAA of Texas, Inc.; and Valeri Williams, Appellees.

No. 2–05–105–CV.

Court of Appeals of Texas, Fort Worth.

March 9, 2006.

Gary L. Richardson and Keith A. Ward, Tulsa, OK, Brian D. Esenwein, Cotten Schmidt, L.L.P., Fort Worth, for appellant.

Thomas S. Leatherbury, Michael L. Raiff and Gabriela A. Gallegos, Dallas, for appellees.

PANEL A: CAYCE, C.J.; DAUPHINOT and McCOY, JJ.

## OPINION

LEE ANN DAUPHINOT, Justice.

This is a libel case involving the alleged publication of defamatory content during multiple television broadcasts. Appellant Lydia H. Grotti, M.D. appeals the trial court's granting of summary judgment in favor of Appellees Belo Corporation, d/b/a Belo; WFAA–TV, L.P., d/b/a WFAA–TV (Channel 8) and WFAA–TV Co.; WFAA of Texas, Inc.; and Valeri Williams ("Me-

dia Defendants"). In seven issues, Dr. Grotti argues that the trial court erred by granting the summary judgment. She complains only about the summary judgment as it pertains to her defamation claims. Because we hold that the Media Defendants established the substantial truth of each broadcast by accurately reporting third-party allegations and investigations, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The summary judgment evidence shows that sometime during the summer of 2000, a physician working at John Peter Smith Hospital ("JPS") contacted WFAA–TV to express concern over patient wait times and understaffing in the emergency room. Valeri Williams, a reporter for WFAA–TV, and Meridith Shucker, a producer for WFAA–TV, researched various conditions at JPS, and in October 2000, WFAA–TV aired its first report on patient wait times and other concerns at JPS. This initial broadcast subsequently caused a number of JPS nurses to contact Williams and relate their concerns to her regarding, among other things, insufficient staffing, equipment failure, and medical mistakes at JPS. WFAA–TV aired a second report on JPS on November 8, 2000 regarding some of these concerns.

Williams and Shucker continued researching JPS and eventually learned about the deaths of Lettie McGhee and Charles O'Keefe, former JPS patients. Through their research, which included discussions with family members of McGhee and O'Keefe, they learned that Dr. Grotti had allegedly removed McGhee from a life support system without consulting McGhee's family and that O'Keefe had died from a morphine overdose while under Dr. Grotti's care.

Beginning in the summer of 2001, Williams and Shucker investigated numerous reports and allegations involving Dr. Grotti and the circumstances surrounding the deaths of McGhee and O'Keefe as part of their continuing investigation into JPS, including the following:

*Texas Department of Health Report:* Williams and Shucker obtained a Texas Department of Health ("TDH") report that concluded in part that the ICU physician (Dr. Grotti) had disconnected McGhee from a ventilator and discontinued life-sustaining drugs without first speaking with McGhee's spouse or representative. Williams and Shucker spoke with various JPS personnel about McGhee's death, and a few of them related that McGhee continued to breathe on her own for about an hour after Dr. Grotti had disconnected her from the ventilator and pronounced her dead. Williams further learned that Grotti had occluded McGhee's endotracheal ("ET") tube by placing her thumb over it. In September 2001, Williams acquired a written statement which included Dr. Grotti's admission that she had occluded McGhee's ET tube approximately one hour after she pronounced McGhee dead.

*Tarrant County Medical Examiner's Autopsy Report:* Williams and Shucker obtained the Tarrant County Medical Examiner's official autopsy report for O'Keefe, which indicated that O'Keefe died of acute morphine intoxication by accident. Upon re-investigation, the medical examiner later identified O'Keefe's death as a homicide.

*Fort Worth Police Department ("FWPD") Investigation:* Williams and Shucker learned that homicide detectives with the FWPD were conducting a "serious investigation" of Dr. Grotti and her involvement in the deaths of McGhee and O'Keefe. Williams conducted an on-camera interview with a FWPD lieutenant confirming this fact.

*Independent Prosecutor:* In the summer of 2001, Williams and Shucker learned that an independent prosecutor had been appointed to handle the criminal prosecution against Dr. Grotti. Both had conversations with the special prosecutor in which he confirmed that there was a homicide investigation of Dr. Grotti.

*JPS Investigation:* During their investigation, Williams and Shucker also learned that JPS, through a peer review committee, was investigating Dr. Grotti for her involvement in the deaths of McGhee and O'Keefe. JPS ultimately suspended Dr. Grotti from the hospital in June 2001, just before WFAA's first broadcast in which Dr. Grotti was mentioned.

*Texas State Board of Medical Examiners' Investigation:* Williams and Shucker learned that the Texas State Board of Medical Examiners was investigating Dr. Grotti's involvement in the deaths of McGhee and O'Keefe. The Board of Medical Examiners temporarily suspended Dr. Grotti's medical license effective August 14, 2002 in an order that included detailed findings of fact and conclusions of law, including findings that Dr. Grotti pronounced McGhee dead while McGhee was on ventilator support, that Dr. Grotti removed McGhee from ventilator support but McGhee continued spontaneous respirations through her ET tube, and that Dr. Grotti acknowledged that she had occluded McGhee's ET tube with her thumb, causing all spontaneous respirations to stop. The temporary order further concluded that Dr. Grotti's "continuation in the practice of medicine would constitute a real and present danger to the health of [her] patients and a continuing threat to the public welfare." By an order signed on October 28, 2003, after Williams and Shucker had left WFAA–TV, the Board of Medical Examiners revoked Dr. Grotti's medical licence and ordered that she im-

mediately cease the practice of medicine in Texas. A Travis County district court subsequently affirmed the Board of Medical Examiners' order revoking Dr. Grotti's medical license.

*Doctors' Opinions and Conclusions:* During their investigation, Williams and Shucker asked other JPS doctors and a forensic pathologist to review O'Keefe's medical file. They also asked the doctors for their opinions regarding McGhee's death. Three of them concluded that Dr. Grotti had euthanized O'Keefe by giving him an overdose of morphine and that occluding McGhee's ET tube would have suffocated her. A fourth doctor, after only a cursory review of the file, believed that Dr. Grotti's actions were highly suspicious.

*McGhee and O'Keefe Families' Allegations and Lawsuits:* Williams and Shucker interviewed the families of McGhee and O'Keefe on numerous occasions (sometimes on-camera) regarding the deaths of their family members. McGhee's daughters expressed doubt and anger concerning the circumstances surrounding Dr. Grotti's treatment of McGhee. Members of McGhee's family subsequently brought a wrongful death suit against Dr. Grotti, alleging that McGhee was still alive when Dr. Grotti discontinued treating her and that Dr. Grotti occluded McGhee's ET tube in order to stop her respirations. Members of O'Keefe's family likewise questioned Dr. Grotti's treatment of O'Keefe, expressing doubt primarily about Dr. Grotti's use of morphine in her treatment of O'Keefe. The O'Keefe family also sued Dr. Grotti, alleging that she ordered that a lethal dose of morphine be administered to O'Keefe.

*Criminal Proceedings:* A Tarrant County grand jury indicted Dr. Grotti for McGhee's murder in October 2003. In 2004, a jury convicted Dr. Grotti of criminally negligent homicide, and, having affir-

matively found that she used her finger as a deadly weapon during the commission of the offense, assessed her punishment at two years' confinement. Dr. Grotti's conviction is currently on appeal.

Between June 28, 2001 and August 15, 2002, WFAA–TV aired a number of investigative reports (described in detail below) covering patient care and concerns at JPS and the circumstances surrounding the deaths of McGhee and O'Keefe. Dr. Grotti was mentioned in all of the reports except the initial broadcast.

Dr. Grotti sued the Media Defendants over the televised broadcasts, alleging that they contained false and defamatory statements about her. The Media Defendants moved for summary judgment on both traditional and no-evidence summary judgment grounds, arguing that the challenged broadcasts are substantially true because they contain accurate accounts of third-party allegations, that the broadcasts are privileged, that Dr. Grotti is a public official and a limited purpose public figure, and that Dr. Grotti's "tag along" claims (conspiracy to defame and intentional infliction of emotional distress) fail as a matter of law. The Media Defendants further filed a supplemental motion for summary judgment arguing that Dr. Grotti was collaterally estopped from relitigating "whether Ms. McGhee was alive when Dr. Grotti occluded her endotracheal tube and whether Dr. Grotti caused a patient's death." The Media Defendants also filed extensive objections to portions of Dr. Grotti's summary judgment evidence, which the trial court sustained in part and

overruled in part. The trial court granted the Media Defendants' motion and supplemental motion in their entirety and signed a final judgment dismissing Dr. Grotti's claims with prejudice. Dr. Grotti argues on appeal that she is not collaterally estopped from bringing her libel action, that the trial court erred by excluding portions of her summary judgment evidence, that the WFAA–TV broadcasts were not substantially true or privileged, that she is not a public figure, and that the Media Defendants acted with malice.

## II. STANDARD OF REVIEW

Because the Media Defendants brought both traditional and no-evidence motions for summary judgment and raised the affirmative defense of substantial truth, and because a no-evidence motion for summary judgment cannot be granted on an affirmative defense, which the asserting party has the burden of pleading and proving as a matter of law,[1] we set forth only the traditional motion for summary judgment standard of review and analyze the Media Defendants' defense in that context.

In a summary judgment case, the issue on appeal is whether the movants met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movants are entitled to judgment as a matter of law.[2] The burden of proof is on the movants, and all doubts about the existence of a genuine issue of material fact are resolved against the movants.[3] Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant.[4]

---

1. TEX.R. CIV. P. 94; *Nowak v. DAS Inv. Corp.,* 110 S.W.3d 677, 679–80 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

2. TEX.R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

3. *Sw. Elec. Power Co.,* 73 S.W.3d at 215.

4. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex. 1965).

A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense.[5] When the trial court does not specify the ground upon which it based its ruling, as in the instant case, the summary judgment will be affirmed on appeal if any of the theories advanced are meritorious.[6]

### III. DEFAMATION

In her fourth issue, Dr. Grotti contends that the WFAA–TV broadcasts were not substantially true. She argues that the Media Defendants defamed her during the multiple television broadcasts by accusing her of murdering McGhee and O'Keefe. She contends that the facts "were deliberately manipulated and juxtaposed to sensationalize the story" and that the gist of the resulting broadcasts was that she was euthanizing or intentionally killing patients at JPS and getting away with it. Dr. Grotti maintains that the statements made during the broadcasts are thus actionable because she was later acquitted in her criminal trial of intentionally euthanizing or intentionally killing McGhee.

The Media Defendants respond that the trial court properly granted summary judgment because they accurately reported third-party allegations and investigations involving Dr. Grotti, thus establishing the substantial truth of each broadcast's "gist." The Media Defendants state,

Grotti also tries to bypass . . . well-established case law by arguing that De-

fendants somehow were making, not just reporting on, the allegations. Indeed, Grotti's entire case seems to be based on this faulty premise that Defendants accused her of euthanizing or murdering patients, when in fact Defendants were reporting on the many allegations and investigations of third parties.

The broadcasting of defamatory statements read from a script is libel rather than slander.[7] Libel is a defamatory statement that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury, to impeach any person's honesty, integrity, virtue, or reputation, or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.[8] To maintain a cause of action for defamation, the plaintiff must establish that the defendant (1) published a false statement about the plaintiff; (2) that was defamatory; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement.[9]

### A. Substantial Truth

"The truth of the statement in the publication on which an action for libel is based is a defense to the action."[10] Similarly, a defendant may defeat a libel claim by establishing the "substantial truth" of the statement.[11] The affirmative

---

**5.** *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).

**6.** *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

**7.** *Christy v. Stauffer Publ'ns, Inc.*, 437 S.W.2d 814, 815 (Tex.1969).

**8.** TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 2005).

**9.** *Dolcefino v. Randolph*, 19 S.W.3d 906, 917 (Tex.App.-Houston [14th Dist] 2000, pet. denied).

**10.** TEX. CIV. PRAC. & REM.CODE ANN. § 73.005.

**11.** *McIlvain v. Jacobs*, 794 S.W.2d 14, 15–16 (Tex.1990); *Randolph*, 19 S.W.3d at 918.

defense of substantial truth is a complete defense with the burden of proof on the defendant.[12] To determine if a broadcast is substantially true, we consider whether the alleged defamatory statement was more damaging to the plaintiff's reputation, in the mind of the average person, than a truthful statement would have been.[13] We look at the "gist" of a broadcast to determine whether it is substantially true.[14]

▮▮▮ "The basis of the defense is that, in order to protect a media defendant's constitutional right to free speech, an article or broadcast will not be considered defamatory, even if some details are inaccurate, so long as the 'gist' of the report is substantially true." [15] If the underlying facts as to the gist of the defamatory charge are undisputed, then we disregard any variance with respect to items of secondary importance.[16] When a case involves media defendants, as it does here, to prove substantial truth, the defendants need only prove that the third-party allegations were in fact made and accurately reported and that the allegations were under investigation.[17] Otherwise,

> the media would be subject to potential liability everytime it reported an investigation of alleged misconduct or wrongdoing by a private person, public official, or public figure. Such allegations would never be reported by the media for fear

an investigation or other proceeding might later prove the allegations untrue, thereby subjecting the media to suit for defamation.[18]

Dr. Grotti states in her brief that she "relies on the 'gist' of the publications as a whole and not the isolated statements that the Media Defendants attempt to extract—standing alone and out of context—to demonstrate the defamation." We thus set out either a large portion of the broadcasts or the broadcasts in their entirety.

**1. June 28, 2001 Broadcast**

▮▮▮ The first broadcast containing disputed statements aired on June 28, 2001. Relevant portions of the broadcast are as follows:

> [News Anchor]: A state investigation of [JPS] in Fort Worth reveals more negligence in the hospital's emergency room. A News 8 Investigation continues.

> [News Anchor]: Two months after News 8 began reporting on the questionable care of ER patients inside the county hospital, the [TDH] began its own review.

> [News Anchor]: Investigators found serious problems with four deaths during a four-month period late last year. . . .

> Valeri Williams: Well, all of those deaths took place between August and

**12.** *Cram Roofing Co. v. Parker,* 131 S.W.3d 84, 90 (Tex.App.-San Antonio 2003, no pet.).

**13.** *McIlvain,* 794 S.W.2d at 16; *Randolph,* 19 S.W.3d at 918.

**14.** *McIlvain,* 794 S.W.2d at 16; *Randolph,* 19 S.W.3d at 918; *KTRK Television v. Felder,* 950 S.W.2d 100, 105–06 (Tex.App.-Houston [14th Dist.] 1997, no writ).

**15.** *Britton Cherish Walters v. Columbia/St. David's Healthcare Sys., L.P.,* No. 03–03–00582–CV, 2005 WL 1240968, at *6 n. 6 (Tex.App.-Austin May 26, 2005, pet. filed).

**16.** *McIlvain,* 794 S.W.2d at 16.

**17.** *Id.; Dolcefino v. Turner,* 987 S.W.2d 100, 109 (Tex.App.-Houston [14th Dist.] 1998), *aff'd, Turner v. KTRK Television, Inc.,* 38 S.W.3d 103 (Tex.2000); *Felder,* 950 S.W.2d at 106; *see also Green v. CBS Inc.,* 286 F.3d 281, 283–84 (5th Cir.2002); *Associated Press v. Boyd,* No. 05–04–01172–CV, 2005 WL 1140369, at *2 (Tex.App.-Dallas May 16, 2005, no pet.).

**18.** *Felder,* 950 S.W.2d at 106.

December of 2000. Our investigation uncovered two of those deaths back in November. But even with what we found, there still were surprises in what state authorities discovered. Now the state report does not identify the patients by name, but through autopsy records and medical files, we've been able to identify three out of the four patients.

. . . .

Valeri Williams: Grandmother Lettie McGee is listed as patient number eight. She too ended up on life support in the ER. But state investigators found that an ICU doctor came in, and in violation of state law, disconnected McGee from the ventilator without ever telling her husband and daughter who sat in the waiting room. The report notes that for an hour afterward, the patient continued to have a heart rate of 50 and difficult respirations.

. . . .

Valeri Williams: Lettie McGee had cancer. Her daughter, Wanda Ragster, told us she would have made that decision to pull her mother off the ventilator because the doctor told her that her mother was already brain dead. Yet staff in the ER say that would have been an impossible diagnosis to make, since determining brain activity requires an EEG. And an EEG test cannot be performed in JPS'[s] emergency room.

Dr. Grotti argues that the gist of every broadcast is that she was euthanizing or intentionally killing patients at JPS. We disagree. Based on our review of the June 28, 2001 broadcast, we conclude that the gist of the report is that the TDH performed an investigation into four deaths at JPS, that an unnamed ICU doctor, later identified as Dr. Grotti, removed McGhee from a ventilator without first consulting members of McGhee's family, in violation of state law, and that McGhee's family

members expressed concerns regarding the doctor's actions.

The Media Defendants' summary judgment evidence demonstrates that the gist of the broadcast is substantially true. A TDH report indicates that an ICU physician (Dr. Grotti) removed a patient (McGhee) from the ventilator and discontinued life-sustaining drugs without first discussing the move with the patient's husband. The report further indicates that the patient's husband, daughter, and son were in the emergency room, that "[t]he facility advanced directive policy requires the physician to include the patient's spouse in making treatment decisions including withholding treatment or withdrawing life-sustaining treatment," and that "the hospital did not ensure [the] patient's rights." Willliams's affidavit states that during her first interview with McGhee's daughter, Wanda Ragster, Ragster indicated that she should have been given the choice to remove her mother from the ventilator and that she would have made "that choice" because Dr. Grotti informed her that her mother had no brain activity. Paula Martin and Jennifer Lovins, nurses who assisted Dr. Grotti in treating McGhee, testified in their depositions that Dr. Grotti disconnected McGhee from the ventilator and pronounced her dead but that McGhee continued to breathe thereafter. The deposition testimony of Dr. Donald McGraw, M.D. demonstrates that the ER is not equipped to determine brain death. At no point during the broadcast did Williams accuse Dr. Grotti of murdering McGhee.

In her reply brief, Dr. Grotti argues that the Media Defendants are liable for the defamatory comments not subject to the judicial/quasi-administrative proceeding privilege provided for in section 73.002 of the civil practice and remedies code and that liability attaches by way of section 578

and section 581 of the Second Restatement of Torts. However, Dr. Grotti provides us with no Texas authority to support this contention, and after conducting our own independent research, we were unable to locate any Texas authority supporting this argument. The case of *Holloway v. Butler*[19] discusses section 578 of the Second Restatement of Torts, but in the context of determining the meaning of "publication" as it pertains to the statute of limitations. We consequently reject Dr. Grotti's argument.[20] Accordingly, because the broadcast accurately reported on third-party allegations and an investigation involving Dr. Grotti, the Media Defendants conclusively established their affirmative defense that the gist of the June 28, 2001 broadcast was substantially truthful.[21]

### 2. August 2, 2001

■ The next broadcast containing disputed statements aired on August 2, 2001. Relevant portions of the broadcast are as follows:

> Valeri Williams: You mean to say, she made a decision to—to make this man die? Not allow him to die, but to make him die?
>
> Kevin Wacasey: Yes. In my opinion, yes. She did.
>
> [News Anchor]: Another questionable death at [JPS]. And this Fort Worth doctor is one of several staff members to say that hospital officials knew an employee was involved in one suspicious death, did nothing, and it happened again....
>
> [News Anchor]: ... Now, a News 8 investigation confirms that Fort Worth homicide detectives are investigating allegations that a JPS doctor has euthanized at least two patients since December.
>
> ....
>
> Valeri Williams: Well, both patients died in the intensive care unit, and it's the chief doctor over that unit who is under police investigation. In January, when a state report concluded that the doctor had broken the law by pulling a patient off life support without telling the family, the hospital took no action. When News 8 reported on the death last month, the doctor was finally suspended. But in the meantime, another patient suspiciously died.
>
> Valeri Williams: Woody O'Keefe was a thirty-three-year-old diabetic who had a seizure in JPS's emergency room. He was transferred to intensive care on a ventilator. And his family says they initially felt fortunate that O'Keefe was to be the patient of the ICU's director, Dr. Lydia Grotti. But Dr. Grotti had some bad news.
>
> ....
>
> Valeri Williams: Woody's aunt and grandmother say Dr. Grotti led them to believe that O'Keefe was brain dead. In fact, Grotti wrote in the chart that O'Keefe was, at the very least, in a vegetative state, and that his outcome was dismal. Yet, according to the medical file, Grotti never ordered any neurological testing, like an EEG, to make such a diagnosis. The family then got O'Keefe's autopsy and they were stunned to read that Woody's real cause of death was acute morphine intoxication.
>
> Dessie Wood: That's why I want to know that's why they gave him so much.

19. 662 S.W.2d 688, 692 (Tex.App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.).

20. *See* Tex.R.App. P. 38.1(h).

21. *See McIlvain*, 794 S.W.2d at 16; *Felder*, 950 S.W.2d at 106.

Shannon Hetter: If he were truly brain dead and knew nothing, what was the need of morphine? . . . .

Valeri Williams: The family had never been told that Woody was given morphine. With their permission, we gave O'Keefe's medical file to several doctors for review. All of them termed O'Keefe's death, at a minimum, highly suspicious. Kevin Wacasey is a former emergency room physician at JPS.

Kevin Wacasey: The chart reflects that the morphine was administered for comfort care. This patient was, in the very least, comatose, and by Dr. Grotti's own admission and diagnosis, brain dead. I don't think he would have felt it if you had set his feet on fire.

Valeri Williams: There's no doubt in your mind that this man was euthanized?

Kevin Wacasey: No doubt.

Valeri Williams: Does that trouble you?

Kevin Wacasey: Very much so.

Valeri Williams: Wacasey and other physicians tell News 8 that the amount of morphine found in O'Keefe's body was more than two times the lethal dosage. O'Keefe died in April. In January, state investigators warned JPS officials that Dr. Grotti had broken the law by yanking this sixty-five-year-old grandmother off life support without telling her family as they sat in the ER waiting room. According to this report, Lettie McGee continued to have a heart rate of fifty and difficult respirations for another hour. Still, Grotti did nothing to try and keep the woman alive. She later told the family that McGee was brain dead. Again, no neurological testing was ever done.

Kevin Wacasey: The investigation that did take place through the official hospital peer review committee at [JPS] in February of this year, in my opinion,

resulted in nothing. And it allowed Dr. Grotti the opportunity to do what she did to Mr. O'Keefe in April.

Dessie Wood: The main thing, is did he have to die right now?

Valeri Williams: Homicide detectives are wondering the same thing. They say they will be pulling files on other patients under Dr. Grotti's care in the coming weeks.

Based on our review of the August 2, 2001 broadcast, we conclude that the gist of the report is that homicide detectives with the FWPD were investigating the deaths of two patients at JPS after allegations of euthanasia were raised against Dr. Grotti.

The summary judgment evidence demonstrates that the gist of the broadcast is substantially true. Williams's affidavit testimony indicates that she was informed by a detective with the Fort Worth Police Department that they were conducting a homicide investigation of Dr. Grotti involving multiple deaths, and a lieutenant with the department confirmed the existence of a "serious investigation" before WFAA–TV aired any reports about Dr. Grotti. The affidavits of Williams and Shucker indicate that a peer review committee investigated Dr. Grotti and that JPS ultimately suspended her in June 2001—before the August 2, 2001 broadcast. The summary judgment evidence also contains a copy of O'Keefe's autopsy report, dated April 5, 2001, which shows that the deputy medical examiner performed O'Keefe's autopsy and determined O'Keefe's cause of death to be acute morphine intoxication.

The allegations of euthanasia in the broadcast are clearly attributable to third parties, not Williams and WFAA–TV. Consistent with the report, Williams states in her affidavit that she and Shucker asked three other doctors and a forensic pathologist to review O'Keefe's medical file.

Williams and Shucker also questioned the doctors regarding McGhee's death. Williams's affidavit indicates that two of the doctors and the pathologist concluded that Dr. Grotti had euthanized O'Keefe by giving him an overdose of morphine, and another doctor, after only a cursory review of the file, believed that Dr. Grotti's actions were highly suspicious. They also reasoned that occluding McGhee's ET tube would have suffocated McGhee. The allegations levied against Dr. Grotti are also partly attributable to members of the O'Keefe family, who expressed concern about Dr. Grotti's treatment of O'Keefe. Williams's affidavit indicates that she interviewed members of O'Keefe's family and that they "did not understand why [O'Keefe] would have been given morphine for pain given the condition he was in and given that they had been told that he was brain dead."

Lastly, the portion of the report that mentions McGhee simply recounts information obtained from the TDH report that was previously aired in the June 28, 2001 broadcast. And Williams's statement in the August 2 report that Dr. Grotti "yank[ed]" McGhee off of the ventilator as opposed to her statement in the June 28 report that she "disconnected" McGhee from the ventilator is of no consequence to our determination regarding the substantial truth of the broadcast. Williams did not accuse Dr. Grotti of euthanizing O'Keefe or McGhee in the broadcast. Accordingly, because the broadcast accurately reported on third-party allegations and multiple investigations involving Dr. Grotti, the Media Defendants conclusively established their affirmative defense that the gist of the August 2, 2001 broadcast was substantially truthful.[22]

### 3. August 3, 2001 Broadcast

■ The next broadcast containing disputed statements aired on August 3, 2001. Relevant portions of the broadcast are as follows:

[News Anchor]: Here, at home, Fort Worth police are investigating two suspicious deaths at [JPS].

[News Anchor]: An intensive care doctor allegedly euthanized two of her patients, but the doctor who turned her in is the doctor out of a job.

. . . .

Valeri Williams: Well, David Cecero had been on the job only four days when this latest wave of controversy hit the hospital. It didn't happen on his watch, but now Cecero is the guy who's got to get to the bottom of it. Dr. Kevin Wacasey is a father of four. Earlier this week, he was marched out of JPS' emergency room by two armed officers and told not to come back. Five days prior, Wacasey had turned Dr. Lydia Grotti in to police for a second suspicious death.

Kevin Wacasey: Physicians and other healthcare professionals are literally required to report physicians or other healthcare professionals whom they believe represent a danger to public health and safety. In my opinion, this was a grave—a matter of grave public concern and I wanted to make sure that this individual, since she was not being appropriately disciplined and appropriately supervised within the hospital setting itself, I wanted to insure that she did not have the opportunity to do what she has done.

Valeri Williams: In January, state investigators warned JPS in this report that Grotti had taken this grandmother off life support without telling her family who was sitting in the ER waiting room. In February, Grotti was summoned to a

---

22. *See McIlvain,* 794 S.W.2d at 16; *Felder,* 950 S.W.2d at 106.

peer review hearing over the death. Hospital officials did nothing. And Grotti continued to have access to patients. In April, Woody O'Keefe was injected with lethal doses of morphine after Grotti pulled him off life support. But it wasn't until July, following a News 8 investigation, that Grotti was finally put on suspension. She has declined comment for this report.

David Cecero: I take this very seriously. So, yeah. There are questions that you are putting on the table here that are very good questions, very legitimate questions.

 . . . .

David Cooke: That's the nature of people who do emergency medicine.

Valeri Williams: David Cooke filed a complaint with the State Board of Medical Examiners against JPS'[s] former emergency room director for the doctor's role in the deaths of three patients and other alleged incidents.

Nat Baumer: No comment.

Valeri Williams: This summer, the state board severely restricted Nat Baumer's medical license. Yet, JPS took no action against Baumer. Instead, Dr. Cooke has been summoned before more than a dozen hospital review committees since filing the complaint.

Valeri Williams: What are you hoping that this new CEO will do?

Kevin Wacasey: I hope that he takes into consideration these issues, doesn't listen to the powers that be there. That he looks at it from having outside experience where hospitals run correctly or at least closer to correct than this one does. And I hope he makes vast, sweeping, necessary changes.

David Cecero: I don't want to sound apologetic, but I've only been here four days. And in four days, does not a world turn.

Valeri Williams: Cecero told us that waiting more than four months to suspend Dr. Grotti was perhaps too long. While on suspension, she continues to be paid. Under a termination agreement, Kevin Wacasey's last paycheck will come in October. Given the chance to keep his job or do what he thinks was right, Wacasey has never looked back.

The physicians group at JPS which fired Wacasey, refused to talk about his termination, except to deny that his role in the Grotti case played a role. Today, police told us that more families of patients under the doctor's care have come forward to report suspicious deaths.

Based on our review of the August 3, 2001 broadcast, we conclude that the gist of the report is that Fort Worth police were investigating two suspicious deaths, which were reported by Dr. Wacasey, whose employment JPS had recently terminated.

Again, the summary judgment evidence demonstrates that the gist of the broadcast is substantially true. Dr. Wacasey's deposition testimony indicates that he reported Dr. Grotti to the TDH and later to the FWPD. Williams's references to Dr. Grotti's alleged misconduct involving McGhee and O'Keefe have their basis in the TDH report as it relates to McGhee, JPS's investigation of Dr. Grotti by a peer review committee, and O'Keefe's autopsy report showing that his cause of death was acute morphine intoxication. The remaining portion of the report's gist—that Dr. Wacasey was terminated by JPS—is not challenged by Dr. Grotti and is therefore undisputed. Accordingly, the Media Defendants conclusively established their affirmative defense that the gist of the August 3, 2001 broadcast was substantially

truthful.[23]

### 4. Sept. 24, 2001 Broadcast

■ The next report containing disputed statements aired on September 24, 2001. It reads as follows:

[News Anchor]: A News 8 investigation has uncovered more evidence in the case of a hospital doctor accused of euthanizing her patients.

[News Anchor]: Dr. Lydia Grotti is an ICU physician at [JPS] who has been on paid suspension while a special prosecutor investigates the death of two patients. Channel 8's Valeri Williams reveals a document in which the doctor admits to blocking the airway of an elderly patient until the woman stopped breathing.

Valeri Williams: The night after Christmas last year, sixty-four-year-old Lettie McGee lay on a gurney in the emergency room, while staff at JPS repeatedly fought to save her. Two, three, maybe four times they had to revive her. But eventually, they say, they had McGee clinging to life on a ventilator. Then Dr. Lydia Grotti from the hospital's ICU took over. And what happened next stunned them all. Without consulting McGee's family who sat just outside in the waiting room, Grotti disconnected McGee from the ventilator. Yet documents show that the grandmother continued to breathe on her own and have a pulse for at least an hour until the doctor showed up again. According to sources, witnesses have told police that Grotti then placed her thumb, like this, over the tube coming out of McGee's mouth, which cut off McGee's supply of oxygen. In a statement to the State Board of Medical Examiners, Grotti admitted that she occluded the endotracheal tube for approximately one minute. Grotti states she did this because the ET tube was prolonging the agony for the family and emergency department staff, who wanted the patient moved somewhere else. There was no room.

Valeri Williams: Is there any reason that you can think of, that a doctor would be doing this?

Kevin Wacasey: No.

Valeri Williams: Not at all?

Kevin Wacasey: None. I can't think of any—I mean, I really cannot think of any reason why a physician, a nurse, a technician, anybody would want to do this to someone.

Valeri Williams: An independent forensic pathologist and other doctors contacted by News 8 concur with Dr. Kevin Wacasey's statement. Wacasey was fired from JPS earlier this summer, one day after reporting Grotti to authorities. However, Dr. Grotti's attorney says Grotti denies all allegations against her. In a letter to News 8, the attorney says that an unnamed medical expert retained by them has concluded that McGee was already dead prior to the doctor's arrival in the ER. The letter states that Dr. Grotti's actions, with respect to the treatment of Ms. McGee, were appropriate and within the standard of care. And that blocking the ET tube would have no effect on this already deceased patient. But other medial professionals argue that if Lettie McGee was already dead, there would have been no reason to cut off the patient's air supply.

Kevin Wacasey: The fact that she did that overt act to hasten that patient's death, in my mind, is an irreversible damnation of her activities.

23. See McIlvain, 794 S.W.2d at 16; Felder, 950 S.W.2d at 106.

Valeri Williams: Next week, Grotti has a hearing before the hospital board regarding her paid suspension. But in recent days, the doctor's legal woes have continued to worsen. Earlier this month, the Tarrant County Medical Examiner revised this patient's death from an accidental overdose of morphine to homicide. . . .

[News Anchor]: The special prosecutor brought in from Harris County to review the suspicious deaths tells News 8 that he will be in Fort Worth within the next two weeks to begin his investigation.

After our review of the September 24, 2001 broadcast, we conclude that the gist of the report is that witnesses accused Dr. Grotti of occluding McGhee's ET tube with her thumb and that Williams obtained a document containing Dr. Grotti's statement that she had occluded McGhee's ET tube with her thumb. The summary judgment evidence demonstrates that the gist of the broadcast is substantially true. Williams reported on the occlusion of McGhee's ET tube for the first time in the September 24, 2001 broadcast after she obtained Dr. Grotti's statement that Dr. Grotti occluded McGhee's ET tube. In the document, Dr. Grotti states, "Instead of removing the ETT, which the Medial Examiner did not want us to do, I occluded the ETT for approx. one minute." Before the broadcast, Williams also conducted additional research and interviewed numerous JPS staff, including nurses who indicated in their deposition testimony that JPS staff questioned Dr. Grotti's occlusion of McGhee's ET tube in the days after it occurred. The circumstances detailed by Williams leading up to Dr. Grotti's occlusion of McGhee's ET tube—that JPS staff revived McGhee, that Dr. Grotti disconnected her from the ventilator, and that

McGhee continued to breathe—originated from Williams's interviews of other JPS staff (including Dr. McGraw and ER nurses and technicians), the TDH report discussed above, and conversations with a detective.

Regarding Williams's concluding remarks, the summary judgment evidence shows Williams learned that an independent prosecutor had been appointed to investigate the "suspicious deaths" and that O'Keefe's autopsy report was revised to indicate that his manner of death was a homicide. The report does not accuse Dr. Grotti of euthanizing McGhee or O'Keefe.

Accordingly, because the broadcast accurately reported third-party allegations directed at Dr. Grotti regarding the occlusion of McGhee's ET tube and the investigations associated therewith, the Media Defendants conclusively established their affirmative defense that the gist of the September 24, 2001 broadcast was substantially truthful.[24]

### 5. March 15, 2002 Broadcast

 The next broadcast containing disputed statements aired on March 15, 2002. It reads as follows:

[News Anchor]: It was more than a year ago that a 64–year–old grandmother was unplugged from life support and allegedly left to die inside the emergency room at [JPS] in Fort Worth. Since then, seven more suspicious deaths have surfaced involving one hospital physician. But tonight in a New[s] 8 investigation, Valeri Williams reports that efforts are underway to try to clear the doctor.

Valeri Williams: The night Lettie McGee died, her family sat at JPS's emergency room never knowing that she had been unplugged from a ventilator or

---

**24.** *See McIlvain,* 794 S.W.2d at 16; *Felder,* 950 S.W.2d at 106.

that she was near death. Records show McGee fought to breathe on her own for nearly an hour. The image of their mother dying slowly and alone still haunts McGee's daughters.

Ava McGee: At least if she was on a monitor or something, we could talk to her or hold her hand, or rub her arm, listen to her heart beat. You know?

Valeri Williams: Unplugging a patient from life support without a family's permission is a violation of state law and hospital policy, but even more horrifying to the family is what happened next. Lydia Grotti was McGee's doctor. In a written statement Grotti admits that she took her thumb and placed it over McGee's airway tube for approximately one minute. Grotti says she did nothing wrong and claims the patient was already dead. But four different physicians have told News 8 that this is a medically unapproved procedure.

Despite these factors, the hospital's Peer Review Committee is recommending to JPS's Board of Managers that Dr. Grotti be cleared in McGee's death. The Peer Review Committee is a secret, but powerful group of doctors, which is supposed to investigate bad patients outcomes.

But at JPS, a lawsuit recently accused the Committee of making decisions based on hospital politics.

Wanda Ragster: I just want to know the truth. And—

Valeri Williams: At this point do you think you are going to get the truth from the hospital?

Wanda Ragster: From the way it seems right now, no.

Valeri Williams: The Peer Review Committee's recommendation to clear Dr. Grotti raises the concern of how much investigation is really going on into a total of eight suspicious deaths at JPS.

News 8 has discovered that in the past 6 months neither the police nor an independent prosecutor appointed to the case has interviewed McGee's family.

Ava McGee: Nobody called or asked any questions or even contacted us about any—he never asked us—I mean, nobody said anything to us.

Valeri Williams: News 8 has also learned that the independent prosecutor has never sent the files of the dead patients off for review by medical experts. Shannon Hetter's nephew died after being given 2.5 times the lethal dosage of morphine. [The][m]edical examiner ruled his death a homicide.

Shannon Hetter: How long is this going to take? Is it going to be two years before we go to grand jury? Are you seriously working on this? He did assure me that he would investigate it thoroughly.

Valeri Williams: Do you believe that today?

Shannon Hetter: It's a little hard to believe today. After this period of time.

Valeri Williams: The Tarrant County District Attorney's office recused itself from the Grotti case in August because it's legally required to represent the public hospital and therefore can't investigate it. However, it was the DA's office that selected the independent prosecutor.

Marvin Collins: Once we step aside, it is out of our hands. So we don't have any ability to go back and say we change our mind.

. . . .

Shannon Hetter: What do you have to do to be punished for your behavior in the medical profession?

Valeri Williams: For the families there is tremendous anxiety that the longer the investigation takes the more likely

people are to forget. And at this point, they are suspicious that that is exactly what county officials want.

Valeri Williams, Channel 8 News—Fort Worth.

[News Anchor]: The independent prosecutor assures everyone involved that his investigation continues.

After our review of the March 15, 2002 broadcast, we conclude that the gist of the report is that there were a number of suspicious deaths involving Dr. Grotti at JPS, that the JPS Peer Review Committee was recommending that Dr. Grotti be cleared of McGhee's death, and that independent investigations by authorities into the deaths of McGhee and O'Keefe were proceeding slowly.

Initially, we note that the report's indication that the Peer Review Committee was recommending that Dr. Grotti be cleared of McGhee's death and the additional statements regarding the investigations by law enforcement officials into the deaths of McGhee and O'Keefe are statements describing an investigation and not allegations directed at Dr. Grotti capable of injuring her reputation.[25] Dr. Grotti argues that the statement made during the introduction to the report that "seven more suspicious deaths have surfaced involving one hospital physician" implied that Dr. Grotti "was responsible for 'eight suspicious deaths at JPS.'" Dr. Grotti contends that Williams did not state the basis for this "allegation" in the report and that "[m]aterial facts underlying this allegation were omitted." We disagree. The complained of statement is not an allegation, literally or impliedly, but an update that additional suspicious deaths involving Dr. Grotti are being investigated. Williams stated in her affidavit that she

learned in her discussions with the independent prosecutor that authorities were "investigating not only the deaths of Ms. McGhee and Mr. O'Keefe, but also six other suspicious deaths involving Dr. Grotti." Indeed, Dr. Grotti admitted during her deposition testimony that in addition to the deaths of McGhee and O'Keefe, she was being investigated for seven other deaths. Because the disputed statement is not merely an unsubstantiated allegation, Dr. Grotti's argument that material facts associated therewith were omitted is without merit.

 The statements that McGhee had been unplugged from a ventilator, that her family waited in the emergency room, that McGhee continued to breathe on her own for "nearly an hour," that removing a patient from life support without first consulting the family violates state law and hospital policy, and that Dr. Grotti occluded McGee's ET tube have all been shown to be substantially true in the above sections according to the TDH report, Dr. Grotti's statement that she occluded McGhee's ET tube, and the affidavits of Williams and Shucker. Contrary to Dr. Grotti's arguments, the Media Defendants did not accuse her of killing McGhee, O'Keefe, or the other six individuals whose "suspicious deaths" were investigated. Accordingly, the Media Defendants conclusively established their affirmative defense that the gist of the March 15, 2002 broadcast was substantially truthful.[26]

### 6. August 5, 2002 Broadcast

 The next broadcast containing disputed statements aired on August 5, 2002. It reads as follows:

[News Anchor]: Another family of a Fort Worth hospital patient who died in

---

**25.** *See* Tex. Civ. Prac. & Rem.Code Ann. § 73.001.

**26.** *See McIlvain,* 794 S.W.2d at 16; *Felder,* 950 S.W.2d at 106.

the emergency room has filed a lawsuit charging the Tarrant County Hospital District, a physicians group, and a doctor with negligence. Patient deaths continue to be the subject of four investigations which began last year. Victims' families complained that authorities have done little to look into the case. The doctor insists she has never done anything to harm a patient. Tonight, Channel 8's Valeri Williams brings us one eye witness account of what happened that night as News 8 investigates.

ER Tech: Yeah. They walked in and saw her in that condition. She was still breathing, still had a heart rate.

Wacasey: Oh, my God. Holy cow.

ER Tech: And I was going—And I told myself—I was like, you know, I want to leave right now. I don't want to be no part of this.

Valeri Williams: The tape was recorded nearly a year ago by Kevin Wacasey, the former JPS hospital physician who reported Dr. Lydia Grotti to authorities. Wacasey has accused Grotti of euthanizing two hospital patients. One, a thirty-three-year-old diabetic man who died in April of 2001, and the other, an elderly grandmother who died in December of 2000. Wacasey claims he was fired from the hospital because he reported the ICU doctor to police. He says that prompted him to collect this evidence. So Wacasey taped a phone call with an emergency room technician who witnessed Dr. Grotti's treatment of Lettie McGee, a patient on life support. He did not tell the technician he was recording her.

ER Tech: And she's like, well, I'm not taking this patient to ICU.

Wacasey: Whoa. She said that right there?

ER Tech: Yes. She goes, I'm not taking this patient to ICU. I'll—I'll have to take her off the vent in the morning, so I might as well do it now. I'll take full responsibility for this patient. I'll put my name on the chart. Went over there, took her off the vent. Never told the family anything.

Valeri Williams: Grotti adamantly denies any wrongdoing. However, state investigators report Grotti violated the law when she removed McGee from life support without the family's permission. McGee's daughter and grandson sat close by in the ER's waiting room.

ER Tech: I mean, everybody was, like, what the [blank] is she doing?

Valeri Williams: This is the first time they have heard an insider's description of what was happening behind closed doors.

Wanda Ragster: It don't make any sense to me. It really don't make any sense to me that they, that whoever didn't care enough to see if she would keep living. Just—just like she wasn't anything.

Valeri Williams: Attorneys for Grotti claim she is an innocent bystander dragged into Wacasey's efforts to retaliate against the hospital. They note Wacasey recently dropped his lawsuit against JPS. In June, Grotti filed a lawsuit over Channel 8's past reports. In a letter to the station, Grotti attorneys state: Dr. Grotti has never in her entire career done any act that would cause or contribute to the death of any of her patients. The attorneys also write that all of the medical records in this case support the fact that Ms. McGee expired at least one hour before Dr. Grotti ever laid eyes on her. And that much of what the ER tech observed, occurred after Ms. McGee's death. They also say the ER tech is incorrect and does not possess the qualifications to determine the quality of pa-

tient care. But the tech, who has an EMT license in life saving, is unwavering in what she saw.

ER Tech: And after she did all her stuff, she goes, well, call me when the patient expires so I can go talk to the family—and left. And went back to the ICU.

Wacasey: Call me when the patient expires?

ER Tech: Yes.

Wacasey: This is after she removed her from the ventilator?

ER Tech: Yes.

Valeri Williams: According to a lawsuit filed last month by the family, Grotti began filling out a medical report stating McGee was dead while the grandmother was still breathing. Then, in her own words, Dr. Grotti admitted to the State Board of Medical Examiners that she blocked the patient's airway tube for approximately one minute.

Wanda Ragster: It's like she has no heart.

Valeri Williams: The ER tech still works for JPS and did not want to be interviewed on camera for this story. However, she has confirmed her statements on the tape to News 8, and she says she has been videotaped by police saying the same thing.

And that brings up a sore subject for everyone involved in this case, including Dr. Grotti. It's been a year since the police, a special prosecutor, the hospital, and the State Board of Medical Examiners all began separate investigations into the patient deaths. Not one of them has issued any findings, whether they would clear Dr. Grotti or keep her from seeing more patients. Valeri Williams. Channel 8 News.

[News Anchor]: JPS officials say they have been investigating McGee's death since February of last year. However, the ER tech told News 8 that no one from the hospital has questioned her about what she witnessed that night. All hospital officials declined to comment for tonight's story, citing the pending investigations and litigation.

After our review of the August 5, 2002 broadcast, we conclude that the gist of the report is that investigations of patient deaths involving Dr. Grotti at JPS remained in progress, that members of McGhee's family filed a lawsuit against Dr. Grotti and others, that an ER technician who witnessed the events surrounding McGhee's death was recorded on audiotape describing what transpired that night, and that Dr. Grotti denied any wrongdoing in the deaths under investigation.

The gist of the broadcast is substantially true. Members of the McGhee family sued Dr. Grotti, alleging that McGhee was still alive when Dr. Grotti discontinued treating her and that Dr. Grotti occluded the ET tube of McGhee in order to stop her respirations. The broadcast, however, merely reported that the lawsuit charged Dr. Grotti and others with negligence; it did not address the specific allegations contained in the petition. Likewise, as discussed above, that an investigation into the deaths at JPS continued is not defamatory.[27] The statements made by Kimberly Short, the ER technician describing the events surrounding McGhee's death, are clearly the words of Short—a third party—and not those of the Media Defendants. Nonetheless, Short's deposition testimony indicates that she made identical remarks in a statement to Fort Worth police and that the statements were true and accurate.

27. *See* Tex. Civ. Prac. & Rem.Code Ann. § 73.001.

The broadcast did not accuse Dr. Grotti of killing her patients; it accurately reported third-party allegations and the status of pending investigations relevant thereto. Accordingly, the Media Defendants conclusively established their affirmative defense that the gist of the August 5, 2002 broadcast was substantially truthful.[28]

### 7. August 15, 2002 Broadcast

 The next broadcast containing disputed statements aired on August 15, 2002. It reads as follows:

[News Anchor]: A Fort Worth based doctor accused of euthanizing two hospital patients has been temporarily stripped of her medical license by state officials. Dr. Lydia Grotti continues to deny that she ever harmed any patients. However, today a disciplinary panel with the State Board of Medical Examiners in Austin, said that she is a continuing threat to the public welfare. Tonight, Channel 8's Valeri Williams has more as News 8 investigates.

Keith Ward: Dr. Grotti does not care to give a statement at this time.

Valeri Williams: Lydia Grotti left immediately following the state board's decision to temporarily suspend her license. Evidence presented during the two-day hearing included revelations that the doctor had once been confined to a military psychiatric facility for more than a month, and had been diagnosed with a narcissistic personality disorder. Grotti was involuntarily discharged from the Air Force.

Keith Ward: I don't think any—any qualified professional has ever found that any part of her psychological make up has in any way has interfered with her ability to treat patients. And I don't

believe that would be accurate to—to suggest that it does.

Valeri Williams: But State Board attorneys noted for the record that during the past year, three out of four different psychiatrists found that Grotti needed psychiatric help, and at the hearing, one was quoted as saying that Grotti showed a total lack of appropriate sensitivity, which presents serious implications for assignments and responsibilities with patients. The record showed that the same information was made available to officials at John Peter Smith Hospital in Fort Worth. Yet, a peer review committee there recommended reinstating her privileges so she could see patients again. However, the hospital board overruled that recommendation.

Valeri Williams: Let me ask you point-blank, did your client euthanize those patients?

Keith Ward: Let me tell you in one word, no.

Valeri Williams: The State Board temporarily suspended Grotti's license based on evidence presented in the deaths of two patients. One was a Fort Worth grandmother who the doctor took off life support without the family's permission. Grotti admits to blocking the patient's airway tube, like this, cutting off all oxygen to the elderly woman. She claims the woman was already dead. But this former JPS physician testified that the patient had a pulse and was breathing when he handed over care to Grotti. Unheard before now is Grotti's claim that a JPS nurse was the first person to block the tube with a piece of paper.

The other patient was a thirty-three-year-old diabetic who's death has been labeled a homicide by the Tarrant Coun-

**28.** *See McIlvain,* 794 S.W.2d at 16; *Felder,* 950 S.W.2d at 106.

ty Medical Examiner due to acute morphine intoxication. However, Grotti testified Woody O'Keefe did not receive an unusually high or toxic dose. She told the Board that she increased O'Keefe's morphine levels because the comatose patient had air hunger, and the family instructed her not to let him suffer. But O'Keefe's aunt, who came to watch the proceeding, says the family never asked for nor was ever told about the morphine.

Shannon Hetter: Because Woody showed no pain whatsoever. I mean we would have never said he was in pain. He was a diabetic. They don't often give morphine to diabetics. So that was a total surprise, and when I did get the medical examiner's report, I thought they had the wrong person when they talked about an overdose of morphine.

Valeri Williams: The State Board's action is the first time in more than a year that anyone has acted to stop Dr. Grotti from seeing more patients at other hospitals. However, patients' families and medical professionals who challenge Grotti, say the system has failed them when it comes to the criminal investigation. Thus far, a special prosecutor from Houston has spent only five days out of the past eleven months in Fort Worth working on the case. Even Grotti's own attorney said during the hearing that a criminal investigation is proceeding at a crawl, and they believe she will never be charged. Valeri Williams. Channel 8 News. Austin.

[News Anchor]: Dr. Grotti will remain on suspension until the review hearing at the end of September.

After our review of the August 15, 2002 broadcast, we conclude that the gist of the report is that the Texas State Board of Medical Examiners temporarily suspended Dr. Grotti's medical license because of her involvement in the deaths of McGhee and O'Keefe.

Williams's affidavit indicates that she attended Dr. Grotti's hearing before the Disciplinary Panel of the Board of Medical Examiners in August 2002. The broadcast begins by detailing portions of the evidence presented during the hearing, including certain aspects of Dr. Grotti's mental health history. Findings of fact 31 and 32 in the temporary suspension order and parts of Dr. Grotti's deposition testimony demonstrate the accuracy of these statements. Williams next asked Dr. Grotti's attorney if Dr. Grotti euthanized McGhee and O'Keefe; she did not assert that Dr. Grotti euthanized McGhee and O'Keefe. The report continues by describing the events surrounding the deaths of McGhee and O'Keefe, which we have already analyzed in detail above. The report concludes by mentioning the status of the criminal investigation into Dr. Grotti's actions, which we have also discussed at length above. The broadcast thus accurately reported on the Board of Medical Examiners' decision to temporarily suspend Dr. Grotti's medical license; it did not accuse Dr. Grotti of euthanizing her patients. Accordingly, the Media Defendants conclusively established their affirmative defense that the gist of the August 15, 2002 broadcast was substantially truthful.[29]

### 8. Overall Holding

In sum, the Media Defendants conclusively established their affirmative defense that the gist of each of the seven broadcasts was substantially truthful as a matter of law. Accordingly, the trial court did not err by granting the Media Defendants'

---

29. *See McIlvain,* 794 S.W.2d at 16; *Felder,* 950 S.W.2d at 106.

motion for summary judgment.[30] Moreover, because the trial court did not specify the ground upon which it based its ruling, we affirm the summary judgment solely on this meritorious theory and do not decide whether Dr. Grotti is collaterally estopped from arguing that she did not cause McGhee's death, whether the broadcasts are privileged, whether Dr. Grotti is a public official and public figure, and whether the Media Defendants acted with malice.[31] We overrule Dr. Grotti's fourth issue and do not reach her first, fifth, sixth, and seventh issues.

### B. Excluded Summary Judgment Evidence

In her second and third issues, Dr. Grotti argues that the trial court erred by excluding portions of the evidence that she submitted in opposition to the Media Defendants' motion for summary judgment. However, even if we disregarded the Media Defendants' objections to Dr. Grotti's summary judgment evidence and the trial court's rulings thereon and considered Dr. Grotti's summary judgment evidence, the Media Defendants would still be entitled to summary judgment because they conclusively proved their affirmative defense of substantial truth as a matter of law.[32] Accordingly, we overrule Dr. Grotti's second and third issues.

### IV. CONCLUSION

Having disposed of all of Dr. Grotti's issues, we affirm the trial court's judgment.

---

**30.** See KPMG, 988 S.W.2d at 748.

**31.** See TEX.R.APP. P. 47.1; Carr, 776 S.W.2d at 569.

**32.** See KPMG, 988 S.W.2d at 748 (stating that defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the defense); Felder, 950 S.W.2d at 108.