**Patricia VICE and Kathie Slotter, Appellants,**

v.

**Daniel J. KASPRZAK, Patricia C. Kasprzak, and Katherine D. Kasprzak, Appellees.**

No. 01–08–00168–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 1, 2009.

Rehearing Overruled Dec. 9, 2009.

Penny Wymyczak–White, Houston, TX, for Appellants.

Jess W. Mason, Mason, Coplen & Banks, P.C., Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, KEYES, and HIGLEY.

## OPINION

EVELYN V. KEYES, Justice.

In this defamation suit, appellants, Patricia Vice and Kathie Slotter, bring an interlocutory appeal challenging the trial court's order that denied their summary judgment motion in favor of the appellees, Daniel J. Kasprzak, Patricia C. Kasprzak, and Katherine D. Kasprzak. In nine issues, Vice and Slotter argue that the trial court erred in denying summary judgment on three publications because (1) the publications were not "of and concerning" the Kasprzaks; (2) the publications were substantially true; (3) Daniel J. Kasprzak is a limited-purpose public figure and (4) no genuine issue of material fact exists on actual malice; (5) one of the publications as to which summary judgment was denied was authored by Lisa Worthen, a non-party; [1] (6) Patricia Kasprzak and Katherine Kasprzak lack standing to bring suit; (7) the Kasprzaks presented no evidence of pecuniary damages; (8) the Kasprzaks failed to plead a tort recognized by the State of Texas and, therefore, their conspiracy claims fail; and (9) because the Kasprzaks have no evidence of the commission of an underlying tort, they have failed to raise a genuine issue of fact on their conspiracy claim.

We reverse and render judgment in favor of Vice and Slotter.

## Background

This dispute centers around animosity between a group of residents in the Newport subdivision in Crosby, Texas and the New Property Owners' Association of Newport, Inc. ("NPOAN"). Daniel Kasprzak, who lives in the Newport subdivision, was involved in the formation of the NPOAN,[2] has served on the Board of Directors of NPOAN since 1996, and served as the President of NPOAN in 1996 for a one-year term. He has served continuously as the Board President since 2001. Daniel is also a licensed Texas attorney and has been a Trustee of the Crosby Independent School District. As an attorney, Daniel has represented Newport Fund, LLC, an entity related to the Newport subdivision's developer, Rampart,[3] in multiple lawsuits that Newport Fund, LLC

---

1. Appellants claim that they have been sued for a letter authored by Lisa Worthen that they did not write, while appellees claim that they are not suing appellants based on Worthen's letter.

2. Kasprzak performed pro bono legal work to help form the homeowners association.

3. Throughout the record, the developer of Newport is referred to by the parties interchangeably as "Rampart," "Rampart Capital Corporation," "Rampart Proprties" (which appears to be a subsidiary of Rampart Capital Corporation), or J.H. (Jim) Carpenter (the President of Rampart Capital Corporation). None of the Rampart entities or officers were made parties to this litigation. We refer to these entities collectively as "Rampart" except when necessary to refer to Carpenter as an individual or to Newport Fund, a related company owned by Carpenter.

has been involved in against Newport property owners.[4]

The local newspapers, the *Highlands Star* and the *Crosby Courier* (collectively referred to as the *Star Courier*), have reported on disputes among the NPOAN members, Daniel Kasprzak, and Rampart, the developer of Newport. A portion of the dispute that led up to the litigation concerned a Newport golf course that is privately owned and a proposed agreement to build and operate a health club facility in the unused portion of the golf club premises. The NPOAN Board ("the Board") formed a committee to study the feasibility of operating a health club facility that resulted in a recommendation to move forward with the negotiations for the venture. After the Board voted to move forward, two of the Board's directors resigned because they intended to campaign for votes against the approval of the health club facility. Apparently, the two dissenting Board members believed that the health club facility would do more benefit to the privately-owned golf course than to the residents of Newport. The NPOAN members understood that the Board planned to raise their maintenance fees to help finance the health facility. The publications pertinent to this dispute include (1) an article entitled, "Newport controversy resumes," written by Lewis Spearman and published on April 6, 2006 by the *Star Courier*, (2) an anonymous flyer circulated to the Newport homeowners, and (3) a letter to the editor written by Vice that was published by the *Star Courier* on April 13, 2006.

The anonymous flyer asked, "What is going on in Newport?" It asserted that the authors had discovered from Harris County real property records: (1) the as-

signment of property owner's delinquent maintenance fee accounts from the bankruptcy trustee for the former Newport developer to Rampart that "gave Rampart the right to collect maintenance fees ONLY (not keep them or spend them for us)"; (2) "[v]arious assignments of an additional 93 properties delinquent on maintenance fees from the NPOAN (signed personally by Dan Kasprzak) to Newport Fund"; and (3) "[t]he 2nd Amendment to the Assignment of Rights and Assumption of Obligations between the NPOAN and [Rampart] filed in December, 2005 which 'forgives all past due assessments on lots [Rampart] obtained through foreclosure on past due accounts....'" The flyer demanded "to see where [Rampart] and/or Newport Fund has EVER turned over to the NPOAN the proceeds from collected past due maintenance fees or from the sale of the foreclosed lots/properties"; to see the meeting records that approved the conveyance of the properties delinquent on maintenance fees to Newport; and to see where the Amendment to the Assignment of Rights and Assumption of Obligations between NPOAN and Rampart forgiving all past due assessment on lots Rampart obtained through foreclosure "was discussed and voted on in PUBLIC that this was in the best interest of the residents of Newport who continue to bear the burden of paying forever increasing maintenance fees."

The flyer pointed out that Rampart and Newport Fund were both owned by Jim Carpenter, the developer of Newport through Rampart, and that "Dan Kasprzak is the NPOAN President & attorney of record for Newport Fund." The flyer further demanded "to see the meeting records that there was full disclosure of Dan's

---

4. The original developer of the property went bankrupt. Rampart purchased certain assets that entitled it to collect maintenance fees from the property owners of Newport. Daniel Kasprzak's representation of Newport Fund began in 2001.

8

representation of Newport Fund and that this was understood and approved." It asserted that the authors of the flyer had learned from the Harris County District Clerk Records that "Newport Fund (with Dan Kasprzak as attorney of record) has brought lawsuits for delinquent maintenance fees on at least 347 properties[,] which court records show Judgment amounts of over $942,566." It declared:

> The former & current Board Member(s) of the NPOAN have some explaining to do. THEY ARE GIVING AWAY OUR MONEY TO THE DEVELOPER. That money could have been used for more amenities and avoided the current rise in maintenance fees. Dan Kasprzak has been assigning to Newport Fund the delinquent maintenance fee accounts (not included in the Assignment from the Bankruptcy Court), representing Newport Fund (not the NPOAN) in ALL collection actions, & filing the 2nd Amended Assignment of Rights and Assumption of Obligations Agreement which "forgives all past due assessments on lots ... Rampart obtained through foreclosure on past due accounts...."

Finally, the flyer stated that numerous requests for information had been denied by the NPOAN. It stated, "We didn't agree to any of this.... We want answers.... Don't YOU?," and it urged homeowners "to attend the Quarterly Meeting April 13th at the Country Club at 7:00 PM to ask your questions of the NPOAN Board."

The letter titled "Newport residents need to wake up" was written by Vice as a Newport "Property–Owner" and appeared on the "Opinion Page" of the April 13, 2006 *Star Courier*. It stated that the Newport homeowners had "recently learned" that Carpenter, the owner of Rampart, the developer of Newport, "ha[d] been purchasing Newport properties obtained through

Harris County Public Tax Sales even when his companies are significantly delinquent in current taxes on other pieces of properties that he has owned for many years in Newport," and it asked, "Isn't this illegal?" It then stated,

> In a current flyer we have also learned that our current NPOAN Board President Dan Kasparzak [sic] makes his living by handling legal matters for Newport properties for the developer Jim Carpenter. We are not talking a few thousand dollars, we are talking millions of dollars. As President of NPOAN and attorney of record for the developer and his many companies he is playing both side [sic] of the fence. This is unethical business and should be reported to the Texas Bar Association by everyone in the subdivision.
>
> Newport property owners are being deceived and exploited by the developer and our current NPOAN Board Members. We need to wake up and take back control and management of running our subdivision.

The April 6, 2006 *Star Courier* article, written by Lewis Spearman and titled "Newport controversy resumes," stated, "The controversy over Newport Subdivision Board's activities with the subdivision's developer is reopened by residents making fresh inferences based on county records." It stated that the controversy was "headed to a showdown on April 13 at the Quarterly Meeting of NPOAN at the Country Club at 7:00 p.m." It further stated, "Newport Funds [sic] brought lawsuits for delinquent maintenance fees on at least 347 properties which court records show collected amounts over $942,566 with the NPOAN Board President as Attorney of Record for Newport Fund, according to Harris County Tax Records." In addition, the article referenced the contents of the flyer and stated that Slotter "indicates that

proceeds (legal fees, maintenance fees collected on the foreclosed lots), from the homeowner are paid directly to the NPOAN President's law firm and/or the deed was conveyed directly to Newport Fund (not NPOAN)." It concluded, "The question is, has the outstanding maintenance fee portion of the collection, or the market value of the lot, ever been remitted to the NPOAN?"

On September 29, 2006, the Kasprzaks sued Vice, Slotter, Dian Demma, Mary Lee Anderson, Bruce Lindsay, Lewis Spearman, Gilbert Hoffman individually and d/b/a Grafikpress, and Grafikpress, Corporation, d/b/a Star Courier Newspapers, the *Highlands Star*, the *Crosby Courier*, and Community Newspapers for defamation, defamation per se, civil conspiracy, and invasion of privacy based on the allegedly defamatory statements, and they sought a declaratory judgment as to the falsity of published statements.

All of the parties filed traditional and no-evidence motions for summary judgment. All of the parties except Vice and Slotter settled and were non-suited from the proceedings. In their traditional motion for summary judgment, Vice and Slotter contended that Daniel Kasprzak was a limited-purpose public figure and a public official, and that he could not prove that Vice and Slotter had acted with actual malice toward him as required for a limited-purpose public figure to prevail in a defamation suit. Vice and Slotter also stated that they had relied on "extensive research and investigation" prior to making the statements in the articles, the letter to the editor, and the flyer. They argued that, as a matter of law, the articles and letters were substantially true and not defamatory. Vice and Slotter also argued that the articles and letters were not "of and concerning" Daniel Kasprzak. Finally, Vice and Slotter argued that Pa-

tricia C. Kasprzak and Katherine D. Kasprzak, Daniel Kasprzak's wife and daughter respectively, were not entitled to relief as a matter of law because these appellees were not mentioned in the article or letters.

In their no-evidence motion for summary judgment, Vice and Slotter argued that the Kasprzaks had presented no evidence that Vice and Slotter libeled them, no evidence of damages, no evidence of defamation per se, no evidence that Vice and Slotter invaded their privacy by intrusion into seclusion, and no evidence of a civil conspiracy.

The Kasprzaks responded that Daniel Kasprzak was not a public official or a limited-purpose public figure, and therefore, actual malice did not apply. Specifically, the Kasprzaks argued that, although Daniel Kasprzak is a Trustee for the Crosby Independent School District, the defamatory statements at issue in the suit did not relate to his status as trustee. The Kasprzaks further argued that Daniel Kasprzak was not a limited-purpose public figure because the controversy at issue is not a public controversy, but just "a grudge held by a few Newport homeowners against the president of their homeowners' association." The Kasprzaks argued that even if Daniel Kasprzak was a public official or a limited-purpose public figure, a fact question existed as to whether Vice and Slotter acted with actual malice.

The Kasprzaks also responded to Vice and Slotter's no-evidence motion for summary judgment. The Kasprzaks pointed out that, in addition to the defamatory statements contained in the flyer, the April 6, 2006 newspaper article attributed to Slotter and the April 13, 2006 letter published by Vice, numerous other slanderous statements were alleged in the Kasprzaks' pleadings and in their summary judgment

affidavits. However, in response to interrogatories, only the foregoing publications were identified by the Kasprzaks as defaming them.

## Jurisdiction

■ As a threshold matter, we determine our jurisdiction over this appeal.

■ Generally, an order denying a motion for summary judgment is interlocutory and, therefore, not appealable. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996). However, Vice and Slotter argue that we have jurisdiction over the denial of their motion for summary judgment in its entirety under section 51.014(a)(6) of the Texas Civil Practice and Remedies Code, which provides that a person may appeal from an interlocutory order that

> denies a motion for summary judgment that is based in whole or in part upon a claim against or a defense by ... a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73.

TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6) (Vernon 2008).

The Kasprzaks argue that section 51.014(a)(6) applies only to Vice and Slotter's appeal of the trial court's order on the Kasprzaks' defamation claim, and not to their claims for invasion of privacy and civil conspiracy, and that, therefore, our jurisdiction is limited to consideration of Vice and Slotter's defamation claim. However, section 51.014(a)(6) expressly provides jurisdiction for the review of an interlocutory order that "denies a motion for summary judgment ... based in whole or in part upon a claim against or a defense by ... a person whose communication appears in or is published by the electronic or print media." *Id.*

In their motion for summary judgment, Vice and Slotter argued that they were entitled to summary judgment on the Kasprzaks' conspiracy claim because the Kasprzaks failed to establish "an underlying tort of defamation." Vice and Slotter also argued in their motion for summary judgment that the Kasprzaks' claim for invasion of privacy by intrusion into seclusion failed because it was based on the publication of allegedly defamatory statements that Vice and Slotter had already argued were not defamatory.

Because the Kasprzaks' claims for conspiracy and invasion of privacy are dependent upon their defamation claims, and thus are "based in part" upon their defamation claims, we hold that the trial court's denial of Vice and Slotter's motion for summary judgment is appealable in its entirety under section 51.014(a)(6).

## Summary Judgment Standard of Review

A defendant moving for summary judgment must either (1) disprove at least one element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of an affirmative defense to rebut plaintiff's cause. *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex.1995). The movant must conclusively establish its right to judgment as a matter of law. *See MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex.2005).

When reviewing the denial of a motion for summary judgment, we apply the same standards as when summary judgment has been granted. *Harvest House Publishers.*

*v. Local Church,* 190 S.W.3d 204, 209 (Tex. App.-Houston [1st Dist.] 2006, pet. denied). Because summary judgment is a question of law, we review a trial court's summary judgment decision de novo. *Bendigo v. City of Houston,* 178 S.W.3d 112, 113 (Tex. App.-Houston [1st Dist.] 2005, no pet.). The standard of review for a traditional summary judgment motion is threefold: (1) the movant must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, the court must take evidence favorable to the nonmovant as true; and (3) the court must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *see* TEX.R. CIV. P. 166a(c).

A party moving for no-evidence summary judgment must assert only that there is no evidence of one or more essential elements of a claim or defense on which the nonmovant would have the burden of proof at trial. *See* TEX.R. CIV. P. 166a(i). The burden then shifts to the nonmovant to produce evidence raising a fact issue on the challenged elements. *See id.* A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.; Forbes Inc. v. Granada Biosciences, Inc.,* 124 S.W.3d 167, 172 (Tex.2003). More than a scintilla of evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Forbes,* 124 S.W.3d at 172.

To be considered by the trial court or reviewing court, summary judgment evidence must be presented in a form that would be admissible at trial. *Hidalgo v. Surety Sav. & Loan Ass'n,* 462 S.W.2d 540, 545 (Tex.1971); *Friday v. Grant Plaza Huntsville Assoc.,* 713 S.W.2d 755, 756 (Tex.App.-Houston [1st Dist.] 1986, no writ). A party must object in writing to the form of summary judgment evidence and place the objections before the trial court, or its objections will be waived. *See* TEX.R. CIV. P. 166a(f); *Grand Prairie Indep. Sch. Dist. v. Vaughan,* 792 S.W.2d 944, 945 (Tex.1990). Failure to secure the trial court's ruling on the objections to the summary judgment evidence also waives the complaint for appeal. *See Roberts v. Friendswood Development Co.,* 886 S.W.2d 363, 365 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

When a party seeks both a traditional and a no evidence summary judgment on the non-movant's claim, we first review the trial court's summary judgment under the no-evidence standards of Rule 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004). If the nonmovant failed to produce more than a scintilla of evidence raising a genuine fact issue on the challenged elements of his claims, then there is no need to analyze whether the movant's summary judgment proof satisfied the traditional summary judgment burden of proof under rule 166a(c). *Id.*

### Defamation

Vice and Slotter moved for summary judgment on the Kasprzaks' defamation claims regarding the two letters to the editor, an anonymous flyer, and an article.[5]

---

5. The Kasprzaks contend on appeal, [Vice's and Slotter's] motions did not focus upon "the editorials and articles," but upon the causes of action asserted by [the Kasprzaks] generally. The [Kasprzaks'] causes of action for defamation are not based solely upon "the editorials and articles," but upon numerous alleged acts of defamatory conduct committed by [Vice and Slotter], both individually and in concert with one anoth-

■ To establish a defamation claim, a plaintiff must demonstrate that (1) the defendant published a factual statement (2) that was capable of defamatory meaning (3) concerning the plaintiff (4) while acting with either negligence, if the plaintiff is a private individual, or actual malice, if the plaintiff is a public figure or public official, concerning the truth of the statement. *See WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998).

er. A finding that the "editorials and articles" were substantially true would not be dispositive of [the Kasprzaks'] defamation claims, as the "editorials and articles" are but the tip of the iceberg with respect to the evidence of actionable conduct by [Vice and Slotter].

We disagree. The Kasprzaks were given ample time in discovery to identify the bases of their defamation claims, yet their supplemental defamation claims identified only the statements challenged by Vice and Slotter's motion for summary judgment. Rule 166a(i), governing no-evidence motions for summary judgment, provides, "After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential element of a claim or defense on which an adverse party would have the burden of proof at trial." Tex.R. Civ. P. 166a(i); *see also Bendigo v. City of Houston,* 178 S.W.3d 112, 114 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (citing *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 70–71 (Tex.App.-Austin 1998, no pet.)). "The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact." Tex.R. Civ. P. 166a(i); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002).

The Kasprzaks identified no additional allegedly defamatory statements until they filed their response to Vice and Slotter's motion for summary judgment. They then set out additional conclusory allegations in affidavits attached to the response, none of which are supported by proof apart from the allegation itself, alluded to these allegations in their response as a refutation of Vice and Slotter's claim that there was no evidence of malice, and then included these allegations in their

## A. Whether the Publications Are "Of and Concerning" Appellees

In their first issue, appellants argue that the publications at issue are not "of and concerning" the plaintiffs, as required to establish a defamation claim. They contend that the publications concerned a matter of controversy within the Newport subdivision and were a criticism of the NPOAN board, "a quasi-governmental en-

brief on appeal as grounds for denying summary judgment on their defamation claims. Summary judgments may be reversed only on issues expressly set out in the motion or response. Tex.R. Civ. P. 166a(c). Issues the non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response, and are not expressly presented by mere reference to the summary judgment evidence. *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 340, 342 (Tex.1993); *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979). Moreover, conclusory and self-serving affidavits submitted as summary judgment evidence by either the movant or the non-movant are not counted as summary judgment evidence. *See* Tex.R. Civ. P. 166a(f) (supporting affidavit must set forth such facts as would be admissible in evidence); *Grant v. Laughlin Environmental, Inc.,* No. 01–07–00227–CV, 2009 WL 793638, at *15 (Tex. App.-Houston [1st Dist.] March 26, 2009, pet. denied) (not designated for publication); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.,* 106 S.W.3d 118, 126 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Id.* An affidavit that makes self-serving, conclusory statements without any underlying factual detail cannot support summary judgment. *Grant,* 2009 WL 793638, at *15; *Haynes v. City of Beaumont,* 35 S.W.3d 166, 178 (Tex.App.-Texarkana 2000, no pet.). Therefore, the Court will not entertain the Kasprzaks' contention on appeal that defamatory statements other than those identified by them in their answers to interrogatories and on which Vice and Slotter based their motion for summary judgment preclude summary judgment on the Kasprzaks' cause of action for defamation.

**13**

tity," not of the individual plaintiffs. They contend that the statements were directed at Rampart, the developer for the Newport subdivision, and NPOAN, the New Property Owners Association of Newport, and were not "of and concerning" Daniel Kasprzak. They also contend that plaintiffs Patricia and Katherine Kasprzak's claims are precluded by the "of and concerning" doctrine since they were "never mentioned or even alluded to" in the publications. In their fifth issue, Vice and Slotter argue that they should have been granted summary judgment on a letter published by Lisa Worthen because they were not the authors of that letter.

▮ A defamatory statement must be directed at the plaintiff as an ascertainable person to be actionable. *Newspapers Inc. v. Matthews,* 161 Tex. 284, 339 S.W.2d 890, 893 (Tex.1960); *Cox Texas Newspapers, L.P. v. Penick,* 219 S.W.3d 425, 433 (Tex.App.-Austin 2007, pet. denied); *Davis v. Davis,* 734 S.W.2d 707, 711 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.) (holding that letter that neither mentioned nor referenced plaintiff was not defamatory). A family member does not have a cause of action based on the defamation of another family member. *Renfro Drug Co. v. Lawson,* 138 Tex. 434, 160 S.W.2d 246, 250 (Tex.1942); *Johnson v. Southwestern Newspapers Corp.,* 855 S.W.2d 182, 188 (Tex.App.-Amarillo 1993, writ denied).

▮ To maintain a defamation action, a plaintiff must be referenced in the complained-of statement. *Newspapers, Inc.,* 161 Tex. 284, 339 S.W.2d at 893. Whether a plaintiff is referenced in a statement is a question of law. *See id.* A publication is "of and concerning the plaintiff" if persons who knew and were acquainted with him understood from viewing the publication that the defamatory matter referred to him. *Allied Mktg. Group, Inc. v. Paramount Pictures Corp.,*

111 S.W.3d 168, 173 (Tex.App.-Eastland 2003, pet. denied) (citing *Newspapers, Inc.,* 339 S.W.2d at 894). It is not necessary that the plaintiff be specifically named in the communication to be defamatory, but it must be clear to those who know and are acquainted with him that the defamatory statement is directed to him. *Penick,* 219 S.W.3d at 433; *Allied,* 111 S.W.3d at 173. The plaintiff need not prove that the defendant intended to refer to him. *Id.* (citing *Ruzicka v. Conde Nast Publications, Inc.,* 999 F.2d 1319, 1322 (8th Cir.1993)). "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." RESTATEMENT (SECOND) OF TORTS § 564 (1977). The false statement must point to the plaintiff and no one else. *Newspapers, Inc.,* 339 S.W.2d at 894.

▮ After reviewing Vice's letter to the editor, we conclude that the trial court properly denied Vice and Slotter's motion for summary judgment on the "of and concerning" element of the Kasprzaks' defamation claim with respect to Daniel Kasprzak because the publication specifically referred to him by name and referred to him as the NPOAN Board President. Vice's letter to the editor stated,

> In a current flyer we have also learned that our current NPOAN Board President Dan Kasprzak [sic] makes his living by handling legal matters for Newport properties for the developer, Jim Carpenter. We are not talking a few thousand dollars, we are talking millions of dollars. As President of NPOAN and attorney of record for the developer and his many companies, he is playing both side[s] of the fence. This is unethical business and should be reported to the Texas Bar Association by everyone in the subdivision.

Likewise, the flyer specifically stated that "Dan Kasprzak is the NPOAN President & attorney of record for Newport Fund"; that "Newport Fund (with Dan Kasprzak as attorney of record) has brought lawsuits for delinquent maintenance fees on at least 347 properties which court records show Judgment amounts of over $942,566"; that "Dan Kasprzak has been assigning to Newport Fund the delinquent maintenance fee accounts ..., representing Newport Fund (not the NPOAN) in ALL collection actions, & filing the 2nd Amended Assignment of Rights and Assumption of Obligations Agreement which 'forgives all past due assessments on lots ... Rampart obtained through foreclosure on past due accounts ...' "; and that "we didn't agree to any of this." It states, "We want answers." Similarly, the April 13, 2006 *Star Courier* article repeats the statement that "Newport Fund brought lawsuits for delinquent maintenance fees on at least 347 properties which court records show collected amounts over $942,566 with the NPOAN Board President as Attorney of Record for Newport Funds [sic], according to Harris County Tax Records."

 However, our review of the allegedly defamatory publications reveals no reference to either Patricia or Katherine Kasprzak. Nor is it reasonable to infer that the complained of statements were intended to refer to either of them. Therefore, we conclude that the trial court erred in denying appellants' motion for summary judgment on Patricia and Katherine Kasprzak's claims.

We overrule Vice and Slotter's first issue as it relates to Daniel Kasprzak. We sustain their first issue insofar as it relates to Patricia and Katherine Kasprzak.[6]

Having concluded that the publications over which Patricia and Katherine Kasprzak sued Vice and Slotter do not refer to either plaintiff, and having concluded that Patricia and Katherine Kasprzak's claims of invasion of privacy and conspiracy are derivative of their defamation claims, we further hold that Patricia and Katherine Kasprzak lack standing to pursue any of their claims in this litigation.

We sustain Vice and Slotter's sixth issue.

## B. Whether Kasprzak Is a Limited Purpose Public Figure

 In their third issue, Vice and Slotter argue that Kasprzak is a limited-purpose public figure for purposes of his defamation claim and that, therefore, he is required to prove that Vice and Slotter published the challenged editorial, flyer, and letter with actual malice. The Kasprzaks respond that Kasprzak is not a public official or limited-purpose public figure, and, therefore, actual malice does not apply. The Kasprzaks argue that although Kasprzak is a Trustee for the Crosby Independent School District the defamatory statements at issue in the suit do not relate to his status as trustee. They further argue that Kasprzak is not a limited-purpose public figure because the controversy at issue is not a public controversy, but just "a grudge held by a few Newport homeowners against the president of their homeowners' association."

---

6. *The fourth document as to which summary judgment was denied, the Worthen letter, failed to reference any of the Kasprzaks, including Daniel. Rather, it questioned NPOAN board actions and urged attendance at the April 13, 2006 homeowners meeting. Vice and Slotter challenge the propriety of* summary judgment on this letter in their fifth issue. However, because the Kasprzaks deny they are seeking damages for defamation against Vice and Slotter based on this letter, we do not address Vice and Slotter's fifth issue separately.

"The degree and burden of proof required in a defamation case hinges on the status of the plaintiff as either a public figure or private individual." *Einhorn v. LaChance*, 823 S.W.2d 405, 412 (Tex.App.-Houston [1st Dist.] 1992, writ dism'd w.o.j.); *see also HBO, A Division of Time Warner Entertainment Co., L.P. v. Harrison*, 983 S.W.2d 31, 35–36 (Tex. App.-Houston [14th Dist.] 1998, no pet.). Freedom of expression upon public questions is secured by the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Moreover, there is a profound national commitment to the principle that debate on public issues should be "uninhibited, robust, and wide-open," even if it includes "vehemently caustic, sometimes unpleasantly sharp attacks" on public figures. *Id.* at 270, 84 S.Ct. at 720; *see also Casso v. Brand*, 776 S.W.2d 551, 554 (Tex. 1989). The question in a libel case brought by a public figure, therefore, is whether statements made in such a context forfeit constitutional protection by the falsity of some of the factual statements made and the defamation of the plaintiff. *Sullivan*, 376 U.S. at 271, 84 S.Ct. at 721.

The Texas courts have adopted the defamation standard set out in *Sullivan* for public officials and public figures. *Casso*, 776 S.W.2d at 554. Under this standard, a public official or public figure bears the burden of proving actual malice by clear and convincing evidence. *See Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726; *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116 (Tex.2000); *see also HBO*, 983 S.W.2d at 36. "Actual malice means that the defendant made the statement knowing that it was false or with reckless disregard about whether the statement was false or not." *McLemore*, 978 S.W.2d at 571 (quoting *Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726); *Cloud v. McKinney*, 228 S.W.3d 326, 339 (Tex.App.-Austin 2007, no pet.). For the actual malice standard to apply, two prerequisites must be met: "First, the plaintiff must be a public official for the purpose of the published statements, and second, the allegedly defamatory statements must relate to the plaintiff's official conduct." *HBO*, 983 S.W.2d at 36.

The higher standard of proof of defamation applies not only to public officials but also to "limited purpose public figures." *See Casso*, 776 S.W.2d at 554; *Einhorn*, 823 S.W.2d at 412–13. Limited-purpose public figures are those persons who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Einhorn*, 823 S.W.2d at 413 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974)).

Texas has established a three-step test to determine whether a defamation plaintiff is a limited-purpose public figure:

(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) the plaintiff must have more than a trivial or tangential role in the controversy;

(3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*McLemore*, 978 S.W.2d at 571.

The editorial, flyer, and letter to the editor alleged in this case to be defamatory were all part of an ongoing public controversy involving a homeowners association and over 2,000 homes. As the Kasprzaks acknowledge, the controversy "has played out in the [*Star Courier*] (which has a circulation of approximately 7,500) and

other local newspapers." The allegedly libelous statements were all made against Kasprzak in his dual capacities as President of the NPOAN Board and as the attorney of record for the developer of Newport. They essentially accused Kasprzak of an improper conflict of interest in taking actions on behalf of the developer and against the interests of the homeowners in his capacity as attorney for the developer, Jim Carpenter, and the developer's companies, Rampart and Newport Fund, without the knowledge and approval of the homeowners.[7]

The public nature of the controversy in the Crosby community and Daniel Kasprzak's more than trivial role in it are attested not only by the nature of the dispute and the admission by the Kasprzaks that the dispute had played out in the local media, but, for example, by the affidavit of Lewis Spearman, author of the challenged April 13, 2006 article, which states, "Several articles and letters to the editor have been published in the [*Star Courier*] regarding disputes involving [NPOAN]. Grafikpress [owner of the *Star Courier* and several other community weekly newspapers] published letters to the editor and articles highlighting the arguments of both sides of the NPOAN disputes." Spearman then lists six articles on the dispute he himself authored between November 24, 2005 and April 13, 2006. The summary judgment record also contains letters to the editor of the *Star Courier* published by Kasprzak, Pat Kasprzak, and Newport Development Joint Venture (signed by "J.H.

(Jim) Carpenter" as "President, Rampart Capital Corporation") presenting the opposing side of the controversy.

We conclude that all three prongs of the *McLemore* test are satisfied and that Kasprzak is a limited-purpose public figure for purposes of his defamation claims. *See McLemore*, 978 S.W.2d at 571. Therefore, the higher "actual malice" standard of proof applies to his defamation claims.

We sustain Vice and Slotter's third issue.

## C. Whether the Challenged Statements Are Defamatory

In their second issue, Vice and Slotter argue that the trial court erred in denying summary judgment on Kasprzak's claims against them because the statements in the letter and flyer are substantially true and not defamatory as a matter of law.

The burden is on a public figure or public official to prove that allegedly defamatory statements made about him in the media were false. *Bentley v. Bunton*, 94 S.W.3d 561, 586 (Tex.2002), *citing Sullivan*, 376 U.S. at 279–80, 84 S.Ct. 710 (requiring that public figure or public official prove falsity); *Turner*, 38 S.W.3d at 117–30.[8] Proof of falsity must be made by a preponderance of the evidence. *Bentley*, 94 S.W.3d at 562 (stating that public figure plaintiff has burden of proving his defamation claim by clear and convincing evidence); *see also Turner*, 38 S.W.3d at 116.

---

7. The Kasprzaks have produced summary judgment evidence that the NPOAN Board approved Kasprzak's serving as NPOAN President while representing the developer in the suits against homeowners, but they have produced no evidence that this information was shared with the homeowners prior to the April 13, 2006 homeowners meeting.

8. The Texas Supreme Court has noted that, with respect to proof of the falsity of allegedly defamatory statements, "the burden of proof on a plaintiff who is not a public official or a public figure suing media defendants is an open question." *Bentley*, 94 S.W.3d at 586, n. 63. Here, however, the plaintiff, Kasprzak, is a public figure and he is suing the defendants over statements published in the local media. Therefore, the rule in *Bentley* applies.

 "[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of [the] publication and not merely on individual statements." *Bentley*, 94 S.W.3d at 579 (quoting *Turner*, 38 S.W.3d at 115); *see also Allied Marketing Group*, 111 S.W.3d at 176; *Provencio v. Paradigm Media, Inc. d/b/a The Texas Network*, 44 S.W.3d 677, 681 (Tex.App.-El Paso 2001, no pet.). Whether language is capable of having a defamatory meaning is a question of law in which the court construes the statement as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it. *Turner*, 38 S.W.3d at 114; *Musser v. Smith Protective Serv., Inc.*, 723 S.W.2d 653, 654–55 (Tex.1987); *Simmons*, 920 S.W.2d at 443.

 A true account that does not create a false impression by omitting material facts or suggestively juxtaposing them is not actionable, regardless of the conclusions that people may draw. *Turner*, 38 S.W.3d at 118. But by omitting key facts and falsely juxtaposing others, a publication may be both false and defamatory. *Id.* The test as to whether the words or statements are actually defamatory is the reasonable person test and not the opinion of the plaintiff. *Simmons v. Ware*, 920 S.W.2d 438, 451 (Tex.App.-Amarillo 1996,

no writ); *Arant v. Jaffe*, 436 S.W.2d 169, 176 (Tex.Civ.App.-Dallas 1968, no writ).

 If the statement, viewed in the applicable light, has only one clear and obvious meaning, no further inquiry is necessary. *Gray v. HEB Food Store No. 4.*, 941 S.W.2d 327, 329 (Tex.App.-Corpus Christi 1997, pet. denied). However, if the statement is ambiguous or cannot be understood without the use of extrinsic evidence, the court must consider innuendo. *Turner*, 38 S.W.3d at 114; *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex.App.-Waco 2005, no pet.). Innuendo may be used to explain but not to extend the effect and meaning of the language. *Simmons*, 920 S.W.2d at 451.

 Courts use the "substantial truth" test to determine whether a factual statement is false. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516–17, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15–16 (Tex. 1990); *Grotti v. Belo Corp.*, 188 S.W.3d 768, 774–75 (Tex.App.-Fort Worth 2006, pet. denied).[9] To determine whether an allegedly defamatory publication is substantially true, we consider whether it is more damaging to the plaintiff's reputation in the mind of the average person than a truthful statement would have been. *McIlvain*, 794 S.W.2d at 16; *Grotti*, 188 S.W.3d at 775; *Simmons*, 920 S.W.2d at 447. This involves looking to the "gist" of

9. The test is the same whether the burden of proving falsity rests on the plaintiff or on the defendant proving the affirmative defense of substantial truth. *McIlvain*, 794 S.W.2d at 15–16 (applying substantial truth standard to proof of falsity with burden on public figure); *see Grotti*, 188 S.W.3d at 774–75 (applying substantial truth standard to affirmative defense to defamation claim with burden of proof on defendant under Tex. Civ. Prac. & Rem.Code Ann. § 73.005). However, it is error to hold that the defendants are required to prove substantial truth as an affirmative de-

fense against a defamation claim brought against them by a public official or public figure. *Bentley*, 94 S.W.3d. at 568–87. This is in contrast to suits brought by private individuals, in which truth is an affirmative defense to slander. *Id.* at 586, n. 63; *see Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 73.005 (Vernon 2005) ("The truth of the statement in the publication on which an action for libel is based is a defense to the action").

the publication. *McIlvain*, 794 S.W.2d at 16; *Grotti*, 188 S.W.3d at 775. The analysis for distinguishing between an actionable statement of fact and a constitutionally protected expression of opinion focuses on the statement's verifiability and the entire context in which it was made. *Simmons*, 920 S.W.2d at 447. If a statement has the same effect on the mind of the average reader as a true statement, then it is not false. *Masson*, 501 U.S. at 517, 111 S.Ct. at 2433; *McIlvain*, 794 S.W.2d at 16. If the article correctly conveys the story's gist but relayed certain details incorrectly, the article will be considered substantially true. *See Turner*, 38 S.W.3d at 115.

 "That a statement is defamatory—that is, injurious to reputation—does not mean that it is false, and vice versa." *Bentley*, 94 S.W.3d at 587. A defamatory statement must be sufficiently factual to be susceptible of being proved objectively true or false, as contrasted from a purely subjective assertion. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21–22, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990). Expressions of opinion may be derogatory and disparaging but nevertheless be protected by the First Amendment of the United States Constitution and by article I, section 8 of the Texas Constitution. *See Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); *Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 340 (Tex. App.-San Antonio 1988, writ denied).

 The determination of whether a publication is an actionable statement of fact or a constitutionally protected statement of opinion, like the determination whether a statement is false and defamatory, is a question of law. *Bentley*, 94 S.W.3d at 580; *see also Turner*, 38 S.W.3d at 114. And, like the determination whether a publication is false and defamatory, the determination whether a publica-

tion is an actionable statement of fact or a protected expression of opinion depends upon a reasonable person's perception of the entirely of the publication. *Bentley*, 94 S.W.3d at 579.

To distinguish between fact and opinion, the Texas Supreme Court has determined that we are to use *Milkovich* as our guide. *Bentley*, 94 S.W.3d at 579. In *Milkovich*, the United States Supreme Court refused to create an artificial dichotomy between 'opinion' and 'fact'. *Id.* at 579–80. Rather, it set out what it took to be existing constitutional doctrine of defamation liability. *Id.* The Texas Supreme Court extrapolated from *Milkovich* the following principles that apply in determining whether a statement is one of opinion or fact: (1) the statement must be provable as false, at least "where public-official or public-figure plaintiffs [are] involved"; (2) constitutional protection is afforded to "statements that cannot 'reasonably be interpreted as stating actual facts'" in order to assure "that public debate will not suffer for lack of 'imaginative expression' or ... 'rhetorical hyperbole.'"; (3) "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth"; or if the statement involves a private figure on a matter of public concern, the "plaintiff must show that the false connotations were made with some level of fault"; and (4) the statements must be given "enhanced appellate review" to assure that these determinations are made in a manner that does not "constitute a forbidden intrusion" into free speech. *Bentley*, 94 S.W.3d at 580.

 Because Vice and Slotter filed both a no-evidence motion for summary judgment and a traditional motion, we first

determine whether Kasprzak has produced evidence of falsity of the publications taken as a whole sufficient to take to a jury and thus whether the allegedly defamatory statements made by Vice and Slotter were capable of having defamatory meaning. *See Turner*, 38 S.W.3d at 114 (stating that whether language is capable of having defamatory meaning is question of law). If so, we determine whether Kasprzak has presented evidence that the false statements made by Vice and Slotter were made with "knowledge of their false implications or with reckless disregard of their truth." *See Bentley*, 94 S.W.3d at 580.

### 1. Article entitled "Newport controversy resumes" and Flyer

 The April 13, 2006 article, written by Lewis Spearman, attributes some of the reporting to Slotter. Specifically, the article states, "Kathie Slotter indicates that proceeds (legal fees, maintenance fees collected, or the foreclosed lots) from the homeowner is [sic] paid directly to the NPOAN President's lawfirm and/or the deed is conveyed directly to Newport Fund (not the NPOAN)." The article and this statement point out that Kasprzak is the NPOAN Board President and also the attorney of record for Newport Fund and that questions have been raised about Kasprzak's dual role.[10]

The flyer also points out that a group of Newport residents have issues with Kasprzak's serving as both the NPOAN Board President and as attorney of record for Newport Fund. The flyer states, "We want to see the meeting records that there was full disclosure of Dan's representation of Newport Funds [sic] and that this was understood and approved." It also states, "Dan Kasprzak has been assigning to Newport Fund the delinquent maintenance fee accounts (not included in the Assignment from the Bankruptcy Court), representing Newport Fund (not the NPOAN) in ALL collection actions, & filing the 2nd Amended Assignment of Rights and Assumption of Obligations Agreement which 'forgives all past due assessments on lots . . . Rampart obtained through foreclosure on past due accounts . . . .' "

Kasprzak has presented no evidence that these statements of fact are false. Rather, the summary judgment evidence shows that Kasprzak was indeed the NPOAN Board President at the time the allegedly defamatory article was written and that he was also the attorney of record for Newport Fund for the collection of delinquent receivables for Newport lots, which were assigned to Rampart by the bankruptcy court. The "Letter to the Residents of Newport from Newport Development Joint Venture," dated April 24, 2006, signed by Jim Carpenter as President of Rampart, and published by the *Star Courier* after the allegedly false and defamatory statements were made states:

> Rampart acknowledges that in 2001 it engaged Dan Kasprzak's law firm, John DeLuca, Kennedy, and Kurisky, Attorneys–at–Law to represent Newport Fund Corporation in the collection of delinquent receivables for lots throughout Newport. These receivables were sold and assigned to Rampart by the

---

**10.** Appellees' Response to Appellants' Brief contains numerous objections to Vice and Slotter's summary judgment evidence. In the absence of a written order or implicit ruling by the trial court, objections to summary judgment evidence are waived and allegedly inadmissible summary judgment evidence remains a part of the summary judgment rec-

ord. *Delfino v. Perry Homes, Jt. V.*, 223 S.W.3d 32, 35 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *In re Estate of Schiwetz*, 102 S.W.3d 355, 360–61 (Tex.App.-Corpus Christi 2003, pet. denied); *Nugent v. Pilgrim's Pride Corp.*, 30 S.W.3d 562, 567 (Tex.App.-Texarkana 2000, pet. denied).

bankruptcy court. Prior to accepting the engagement, Mr. Kasprzak performed a conflicts of interest check with his firm and disclosed his pending representation to every member of the Board of Directors for CISD and NPOAN. All parties agreed that Dan's involvement would accelerate the resolution of the delinquent accounts receivable (all accounts had both severe past due homeowners' maintenance fees and/or property taxes) which had greatly hindered [Crosby I.S.D.], NPOAN, an [Newport M.U.D.] for many years.

In addition, an April 13, 2006 *Star Courier* article in the summary judgment record, likewise written by Spearman, states that, in response to the flyer, Carpenter had "represented that the developer has not violated any provisions of its agreements with the bankruptcy court, NPOAN, Crosby I.S.D. or Newport M.U.D."; that Carpenter had shown by county court records that "Rampart was granted by the Bankruptcy Trustee delinquent accounts for maintenance fees from various property owners in Newport Subdivision in the total amount of $3,177,946.60"; and that "Carpenter also presented an affidavit for Filing Dedicatory Instruments for [NPOAN] sworn Oct. 4, showing that 'Rampart hereby grants and assigns to NPOAN its rights to assess and collect all future monthly maintenance charges, fees, dues and assessments, arising or accruing after the date hereof' and later indicating that the agreement does not grant the NPOAN any rights to collect or receive any portion or any amounts collected by Rampart."

These statements do not refute the factual statements in the anonymous flyer and the April 13, 2006 article; they support them. Moreover, these disclosures were made *after* the flyer was distributed and before Kasprzak brought his claims

alleging that appellants had published false statements of fact about him. They undermine, rather than support, Kasprzak's ability to prove the falsity of appellants factual statements. *See Bentley*, 94 S.W.3d at 579 (placing burden of proving falsity on public figure defamation plaintiff).

Kasprzak also complains that the *Star Courier's* report, based on its interview with Slotter, was inaccurate and defamatory in stating that "Newport Funds [sic] brought lawsuits for delinquent maintenance fees on at least 347 properties which court records show *collected* amounts over $942,566 with the NPOAN Board President as Attorney of Record for Newport Fund, according to Harris County Tax Records." (Emphasis added). Kasprzak contends that these were judgment amounts, as stated in the flyer, not collections. If an article correctly conveys the story's gist but relays certain details incorrectly, the article will be considered substantially true and therefore not defamatory. *See Turner*, 38 S.W.3d at 115.

Kasprzak's real complaint is based on innuendo that arises from the characterization of the language in the challenged documents and from the characterization of Vice and Slotter's extraneous words and actions by two NPOAN board members in affidavits attached as summary judgment proofs to the Kasprzaks' response to summary judgment and by appellees Daniel and Patricia Kasprzak themselves and the Newport developer, Carpenter, in their affidavits and other summary judgment proofs. For example, Carpenter's "Letter to the Residents of Newport" characterizes the flyer as accusing Rampart of "embezzlement" and Kasprzak of "conspiring with Rampart." No such language appears in the flyer, the letter, or the April 13, 2006 article, and no such characterization of Kasprzak's actions is reasonably inferable

from the language of these documents. The Kasprzaks' own characterization of the allegedly defamatory statements cannot form the basis for a defamation suit against Vice and Slotter. *See Simmons*, 920 S.W.2d at 451; *Arant*, 436 S.W.2d at 176.

We conclude as a matter of law that neither the April 13 article nor the flyer is defamatory.

### 2. *Letter to the Editor*

 In her letter to the editor, Vice raises questions about Kasprzak's role as the NPOAN Board President and his other role as attorney of record for the Newport Fund and Rampart. In one paragraph, Vice states,

> In a current flyer we have also learned that our current NPOAN Board President, Dan Kasparzak [sic] makes his living by handling legal matters for Newport properties for the developer, Jim Carpenter. We are not talking a few thousand dollars, we are talking millions of dollars. As President of NPOAN and attorney of record for the developer and his many companies, he is playing both sides of the fence. This is unethical business and should be reported to the Texas Bar Association by everyone in the subdivision.

Like the flyer and the April 13, 2006 article, this publication, read as a whole, fails to convey a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing true facts. Rather, Vice states that Daniel Kasprzak is the President of NPOAN, the homeowner's association that presumably serves the interests of Newport residents, while at the same time representing Newport Fund, an entity related to the developer client that has developed Newport and has collected delinquent maintenance fees from homeowners through suits

brought on the developer's behalf by Kasprzak. It is undisputed that since 2001, Daniel Kasprzak, as an attorney, has represented Newport Fund, a company owned by the developer of Newport, while at the same time serving as the President of the NPOAN. It is also undisputed that Kasprzak has represented Newport Fund in suits against the NPOAN homeowners for the collection of delinquent maintenance fees in the amounts and that there have been public disputes, widely reported in Newport, over whether Kasprzak's actions have benefitted his client, Newport Fund, and himself, as attorney for Newport Fund, at the expense of the NPOAN. There is no evidence that these statements are false. To the contrary, Kasprzak testified as follows in his deposition:

Q. Were there occasions where the deed was conveyed directly to the Newport Fund?

A. I'm sure there were some occasions where that happened.

Kasprzak also testified in his affidavit, "The only payments that have ever been made have been payments to my firm for legal services which were performed for Newport Fund and invoiced on an hourly basis at rates equal to or below my firm's standard hourly rates." And he further testified in his deposition:

A. We sued them [NPOAN homeowners] because they were delinquent on their maintenance fees.

Q. Were some of these maintenance fees that had been assigned to Rampart?

A. Most of them were maintenance fees that had been assigned to Rampart—

. . . .

Q. Wasn't ... the assignment for Rampart and the decision to pursue these very stale claims made for [the] purpose of generating money

that Rampart could use as a developer or—and/or to pay bills or anything it chose to?

A. Are you talking about the assignment from the bankruptcy trustee to Rampart?

Q. Yeah. Yeah.

A. They were assigned as an asset of the estate, and I think it was implicit, or at least it was their understanding at the time that they— those funds they had collected could be used for whatever they wanted.

The statement in Vice's letter that Kasprzak "makes his living by handling legal matters for Newport properties for the developer Jim Carpenter," and that "we are talking millions of dollars" is supported by the April 20, 2006 article in the *Star Courier*, written after Vice's letter appeared and after the Kasprzaks had presented their response, which states that Carpenter had shown by county court records that "Rampart was granted by the Bankruptcy Trustee delinquent accounts for maintenance fees from various property owners in Newport Subdivision in the total amount of $3,177,946.60."

▆ Nor does Vice's statement that Kasprzak had engaged in "unethical business" by making his living by handling legal matters for Newport properties for Carpenter while serving as NPOAN board chairman rise to defamatory meaning in the absence of a false or misleading statement of fact, because the statement is Vice's "individual judgment that rests solely in the eye of the beholder" and is based on undisputed facts. *See Falk & Mayfield L.L.P.*, 974 S.W.2d at 824 (concluding that term "lawsuit abuse" is expression of opinion). "Admittedly, the accusation is derogatory and disparaging, but this is no different than saying that one is ugly, scurrilous, or disgusting." *Id.* Moreover, Vice's request that Kasprzak be reported to the

Texas Bar Association is not a statement of fact—it is a call to action based on Vice's opinion that Kasprzak's behavior was unethical due to his dual role—and thus, not defamatory. *See id.; see also Reedy v. Webb*, 113 S.W.3d 19, 21–25 (Tex. App.-Tyler 2002, pet. denied) (affirming summary judgment against contractor who sued reporter and television station for defamation in broadcast and web article, including call for homebuyers to contact builder or city to determine if house had passed all inspections, where allegedly defamatory statements were substantially true); *cf. Texas Disposal Sys. Landfill, Inc. v. Waste Mgt. Holdings, Inc.*, 219 S.W.3d 563, 576–77 (Tex.App.-Austin 2007, pet. denied) (affirming summary judgment against landfill operator's competitor who published "Action Alert memo" that knowingly including false and misleading statements with admitted intent of conveying message that defendant was not in compliance with landfill regulations and ended with call to action encouraging readers to contact certain local and county officials "to let them know of your environmental and traffic concerns."). We conclude that Vice's statements are expressions of opinion based on substantially true factual statements and are protected by the First Amendment of the Constitution and Section 8, article I, of the Texas Constitution. *See Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex.1989) ("All assertions of opinion are protected by the first amendment of the United States Constitution and article I, section 8 of the Texas Constitution.").

▆ Finally, Vice's statement in the April 13 letter that "[t]he NPOAN Board promises to increase our monthly assessments if a threatened lawsuit goes forward" is likewise true and unactionable in that it republishes information from the NPOAN newsletter authored and distributed by the NPOAN Board of Directors, of

which Kasprzak was president at the time. The NPOAN newsletter stated that the letter from the Board advised homeowners "that if this matter goes forward into litigation it will be extremely costly and could result in a special assessment or an increase in the monthly maintenance fees to cover the additional legal fees."

We conclude the three publications challenged in Vice and Slotter's motion for summary judgment were not defamatory.

We sustain Vice and Slotter's second issue.

Because we conclude that none of the challenged publications were actionable as defamatory statements, we conclude that the trial court erred in denying Vice and Slotter's motion for summary judgment on the Kasprzaks' defamation claims. Because this issue is dispositive, we need not reach Vice and Slotter's remaining grounds for reversing the trial court's ruling denying summary judgment on defamation. See TEX.R.APP. 47.1.[11]

## Invasion of Privacy and Conspiracy

In their eighth issue, Vice and Slotter argue that the Kasprzaks' invasion of privacy claim fails as a matter of law because it was based solely on the publication of the allegedly defamatory statements.[12] See Gill v. Snow, 644 S.W.2d 222, 223–24 (Tex.App.-Fort Worth 1982, no writ) (stating elements of invasion of privacy by intrusion are (1) intentionally intruding (2) upon solitude of another or his private

affairs (3) which is highly offensive to reasonable person). In their ninth issue, Vice and Slotter argue that the Kasprzaks' conspiracy claim fails because they presented no evidence of the commission of an underlying tort. See Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex.1996) (stating that defendant's liability for conspiracy depend on participation in some underlying tort). In their sixth issue, Vice and Slotter argue, in addition, that Patricia and Katherine Kasprzak lack standing to bring this suit because they have not been defamed or otherwise harmed by the publications they complain of.

Because we have already held that the statements at issue in this case were not actionable as defamatory statements as a matter of law against Daniel Kasprzak and were not "of and concerning" Patricia or Katherine Kasprzak, and because the Kasprzaks rely on the existence of defamatory statements as the basis for claiming they were harmed by Vice's and Slotter's invasion of their privacy and conspiracy, we conclude that those derivative claims also fail as a matter of law. See Patterson v. Planned Parenthood of Houston, 971 S.W.2d 439, 442 (Tex.1998) (identifying standing as a threshold issue that implicates subject matter jurisdiction and emphasizing need for concrete injury to plaintiff for justiciable claim to be presented). Therefore, we conclude that the trial court erred in denying Vice and Slotter's motions for summary judgment on the Kaspr-

---

11. In their fourth issue, Vice and Slotter argue that no genuine issue of material facts exists as to malice. In their seventh issue, Vice and Slotter argue that the Kasprzaks presented no evidence of pecuniary damages.

12. Vice and Slotter argue that the Kasprzaks' reliance on the publication of allegedly defamatory statements as the sole basis for the invasion of privacy by intrusion into seclusion claim means that their claim is actually one

for false light invasion of privacy, which is a tort that Texas courts do not recognize as a cause of action. See Cain v. Hearst Corp., 878 S.W.2d 577, 579 (Tex.1994). We do not address this aspect of their eighth issue because we determine that the Kasprzaks' claim fails regardless of whether it was one for false light invasion of privacy, as argued by Vice and Slotter, or invasion of privacy by intrusion into seclusion, as plead by the Kasprzaks.

**24** 

zaks' invasion of privacy and conspiracy claims.

We sustain Vice and Slotter's sixth, eighth, and ninth issues.

### Conclusion

We reverse the trial court's order denying Vice and Slotter's motions for summary judgment and render judgment that appellees Patricia C. Kasprzak and Katherine D. Kasprzak be dismissed for lack of standing and that appellee Daniel J. Kasprzak take nothing on his claims against appellants.